## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Fred Baumeister, Kenneth Berkeihiser, Dwayne Clauser, John Conlin, Carl S. Lehman, Greg Mattioni, and William Riale, individually and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Exelon Corporation, the Investment Oversight Committee, the Board of Directors of Exelon Corporation, the Corporate Investment Committee, Vanessa Hecht, Jennifer Franco, Douglas J. Brown, and Jane and John Does 1-30,<br><br>Defendants. | Civil Action No. 21-cv-6505 |

## CLASS ACTION COMPLAINT

Plaintiffs Fred Baumeister, Kenneth Berkeihiser, Dwayne Clauser, John Conlin, Carl S. Lehman, Greg Mattioni, and William Riale, on behalf of the Exelon Corporation Employee Savings Plan (the "Plan"),[1] themselves and all others similarly situated, allege the following:

### INTRODUCTION

1.      This is a class action brought pursuant to §§ 406, 408, 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1106, 1108, 1109 and 1132, for breaches of fiduciary duties against the Plan's fiduciaries, which include Exelon Corporation

---

[1] The Plan is a legal entity that can sue and be sued. *See* the Employee Retirement Income Security Act of 1974 ("ERISA") § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to § 409, and the case law interpreting it, the relief sought in this action is for the benefit of the Plan, its participants and beneficiaries.

("Exelon" or the "Company"), the Investment Oversight Committee (the "IOC"), the Board of Directors of Exelon Corporation, the Corporate Investment Committee (the "CIC"), Vanessa Hecht ("Hecht"), Jennifer Franco ("Franco"), Douglas J. Brown ("Brown"), and Jane and John Does 1-30.

2.      Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement. As of the end of 2020, Americans had approximately $9.6 trillion in assets invested in defined contribution plans. *See* INVESTMENT COMPANY INSTITUTE ("ICI"), *Retirement Assets Total $34.9 Trillion in Fourth Quarter 2020* (Mar. 18, 2021).[2]

3.      Plaintiffs were participants in the Plan during the Class Period (defined below), during which the Plan's fiduciaries breached their duties of prudence and loyalty to the Plan and its participants by, among other things: (a) selecting and maintaining investment options that were materially more expensive and performed materially worse than alternatives that were available in the marketplace; (b) causing the Plan to pay excessive fees for recordkeeping and other administrative services; and (c) allowing a third-party consultant to charge the Plan unreasonably high fees for participant advisory services, which fees the consultant kept for itself or shared with another Plan service provider.

4.      401(k) plans, like the Plan, incentivize saving for retirement or other long-term goals, including home ownership and higher education. In such defined contribution plans, "participants' retirement benefits are limited to the value of their own individual investment accounts, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). Thus, absent legal protections for employee-participants, the employer has limited incentive to keep costs low or to

---

[2] Available at https://www.ici.org/node/836811 (last visited April 22, 2021).

2

closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly performing investment options are borne by the participants.

5.     Defendants, as Plan "fiduciaries," as the term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties owed to Plaintiffs and the other participants and beneficiaries of the Plan in violation of §§ 404(a) and 405, 29 U.S. C. §§ 1104(a) and 1105.

6.     Specifically, in Count I, Plaintiffs allege that Defendants breached their fiduciary duties to Plaintiffs, the Plan and members of the Class by failing to prudently and loyally manage the Plan's investments by: (1) selecting and maintaining as investment options certain custom or proprietary funds, including target date funds (the "Target Date Funds"), the managers for which were selected by the Exelon Investment Office ("EIO"), which Target Date Funds charged significantly higher fees than other, similar funds available in the marketplace, even though the Target Date Funds significantly underperformed other, similar funds in the marketplace; (2) causing the Plan to pay excessive recordkeeping and/or administrative expenses; and (3) making available to Plan participants advisory services even though the fees for these services were higher than comparable, commercially-available advisory services and even though the service provider either kept all of these high fees for itself or else kicked back a portion of these fees to another Plan service provider. These failures on Defendants' part cost Plaintiffs and other Plan participants millions of dollars and constituted breaches of Defendants' ERISA's fiduciary duties of prudence and loyalty, undermining the purpose of 401(k) plans—to maximize participants' retirement savings. *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

7.     Plaintiffs' Count II alleges that Exelon breached its fiduciary duties by failing to adequately monitor other persons to whom management and/or administration of Plan assets were

3

delegated, despite the fact that Exelon knew or should have known that such other fiduciaries were imprudently allowing the Plan to select and maintain risky investment options and pay excessive fees.

8.　　At all relevant times, the Plan's fees for investment management and administrative services were excessive when compared with comparable 401(k) plans that had similar numbers of plan participants and similar amounts of assets under management.

9.　　This action seeks to recover the Plan's losses that Defendants are liable for under ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132. Because Plaintiffs' claims apply to the Plan, which includes all participants with accounts invested in funds offered during the Class Period, Plaintiffs bring this suit as a class action on behalf of the Plan and all participants and beneficiaries of the Plan during the proposed Class Period.

## JURISDICTION AND VENUE

10.　　This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

11.　　This Court has personal jurisdiction over Defendants because they are headquartered and transact business in, or reside in, and have significant contacts with, this District, and because ERISA provides for nationwide service of process.

12.　　Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the ERISA violations occurred in this District, and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C.

§ 1391, because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### Plaintiffs

13.    Plaintiff Fred Baumeister is a citizen and resident of West Chester, Pennsylvania. Plaintiff Baumeister has been employed by the Pennsylvania Electric Company ("PECO"), an Exelon subsidiary, since 1989 and is currently employed there as a Lineman.

14.    Plaintiff Baumeister was a participant in the Plan during the Class Period.  As a participant, and within the applicable statute of limitations, Plaintiff Baumeister invested in the Fixed Income Fund and the Target Date Retirement 2055 Fund.

15.    Plaintiff Kenneth Berkeihiser is a citizen and resident of Douglasville, Pennsylvania. Plaintiff Berkeihiser has been employed by PECO since 1989 and is currently employed there as a Lineman.

16.    Plaintiff Berkeihiser was a participant in the Plan during the Class Period. As a participant, and within the applicable statute of limitations, Plaintiff Berkeihiser invested in the Target Date Retirement 2015 Fund.

17.    Plaintiff Dwayne Clauser is a citizen and resident of Douglasville, Pennsylvania. Plaintiff Clauser has been employed by PECO since 1985 and is currently employed there as a Lineman.

18.    Plaintiff Clauser was a participant in the Plan during the Class Period. As a participant, and within the applicable statute of limitations, Plaintiff Clauser invested in the Target Date Retirement 2020 Fund, the Target Date Retirement 2055 Fund, and the Northern Trust U.S. Government Bond Fund.

5

19.     In the third quarter of 2018, Plaintiff Clauser became aware that there were more investment options in the Plan than there appeared.  Specifically, the so-called "Expanded Choice Funds," which were not immediately accessible when he logged into his retirement account, and he recalls having to sign additional materials in order to access those options and invest in them.

20.     Plaintiff John Conlin is a citizen and resident of Kennett Square, Pennsylvania. Plaintiff Conlin has been employed at PECO since the late 1980s and is currently employed there as a Lineman.

21.     Plaintiff Conlin was a participant in the Plan during the Class Period. As a participant, and within the applicable statute of limitations, Plaintiff Conlin invested in the Target Date Retirement 2025 Fund, the Target Date Retirement 2035 Fund, and the Target Date Retirement 2060 Fund.

22.     Approximately a year ago, a co-worker informed him that there were additional investment options available in the Plan, the Expanded Choice Funds. He was previously unaware of these options, and when he logs into his retirement account, he is unable to see them as choices.

23.     Plaintiff Carl S. Lehman is a citizen and resident of Schwenksville, Pennsylvania. Plaintiff Lehman has been employed at PECO since the late 1980s and is currently employed there as a Lineman.

24.     Plaintiff Lehman was a participant in the Plan during the Class Period. As a participant, and within the applicable statute of limitations, Plaintiff Lehman invested in the Target Date Retirement 2040 Fund, the US Equity Fund, and the International Equity Fund.

25.     In the fourth quarter of 2019, Plaintiff Lehman became aware of the Expanded Choice Funds as investment options in the Plan. In order to access these options in his online

6

account and to invest in them, he was required to sign several forms. Only then were the Expanded Choice Funds available as investment options for him to choose when he logged into his account.

26. Plaintiff Greg Mattioni is a citizen and resident of Downingtown, Pennsylvania. Plaintiff Mattioni has been employed at PECO since the late 1970s and is currently employed there as a Lineman.

27. Plaintiff Mattioni was a participant in the Plan during the Class Period. As a participant, and within the applicable statute of limitations, Plaintiff Mattioni invested in US Equity Fund, the International Equity Fund, and certain BlackRock investment options. He also used the advisory services of Financial Engines, to which he has paid thousands of dollars.

28. Plaintiff William Riale is a citizen and resident of Forest Hill, Maryland. Plaintiff Riale is employed by the Baltimore Gas and Electric ("BGE"), an Exelon subsidiary, as a Lineman.

29. Plaintiff Riale was a participant in the Plan during the Class Period. As a participant, and within the applicable statute of limitations, Plaintiff Riale invested in the US Equity Fund.

**Defendants**

30. Exelon is a Pennsylvania corporation headquartered in Chicago, Illinois and engaged in the business of energy generation, sale, and delivery throughout the United States. It is a holding company, and its subsidiaries include various utility companies and plants throughout the United States, including PECO. Through its Board of Directors, it appoints Exelon employees to serve as Plan Administrator and to select and monitor the investment options and service providers to the Plan.

31. Defendant Exelon is the Plan Sponsor and Plan Administrator and a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a)

Exelon is designated as the Plan Administrator and a named fiduciary pursuant to Section 11.1 of the Plan; (b) during the Class Period, it exercised discretionary authority and control over Plan management, and authority or control over management or disposition of Plan assets; and (c) it appointed Plan fiduciaries through Exelon's Board of Directors or a committee of the board, which was entrusted with the authority to control the management, operation and administration of the Plan.

32. During the Class Period, Defendant IOC was responsible for general oversight of Exelon's investment management functions and "monitor[ed] and receive[d] periodic reports concerning the investment performance of the . . . investment options under the savings plans."[3]

33. Within the Class Period, the IOC was disbanded, and now the entire Board of Directors fulfills this function, relying upon an annual report from its appointees. As such, during the Class Period the Board of Directors of Exelon Corporation was a fiduciary because it exercised discretionary authority and control over Plan management and over management or disposition of Plan assets, and it appointed Plan fiduciaries, entrusting those appointees with the authority to control the management, operation and administration of the Plan.

34. Defendant CIC is a group comprised of Exelon employees, including the Chief Investment Officer. The CIC approves investment strategy, allocations and investment limits of the Plan. The CIC and its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.

---

[3] *See* https://www.exeloncorp.com/leadership-and-governance/board-committees/Pages/investment-oversight-committee.aspx (last visited December 6, 2021).

35.     Defendant Vanessa Hecht serves as the current Director of Employee Benefit Plans and Programs, and as such is the Plan Administrator and has day-to-day administration responsibility for the Plan. Defendant Hecht signed the Plan's 2019 Form 5500 as Plan Administrator.

36.     Defendant Jennifer Franco previously served as the Director of Employee Benefit Plans and Programs, and as such was the Plan Administrator and had day-to-day administration responsibility for the Plan, from 2014 until 2019. Defendant Franco signed the Plan's 2014-2018 Form 5500s as Plan Administrator.

37.     Defendants Hecht and Franco were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.

38.     During the Class Period, Defendant Exelon also acted through one of its departments, the Exelon Investment Office (the "EIO") and those Exelon employees assigned to the EIO. The EIO had the authority to select and/or monitor the investment options made available to Plan Participants and to develop and oversee the implementation of any investment education program. The EIO also had discretionary authority in regard to the composition and management of the proprietary Target Date Funds, selecting the underlying investment managers and, therefore, the asset classes used for managing the asset allocations for each of the Target Date Funds, as well as substantial control of the "glide path," or ratio of riskier to less risky investments that changes over time until a selected projected retirement date for fund participants.  The duties of the EIO included:

- Select and monitor the investment options of the Plan.

9

- Approve the appointment of investment managers for the Plan, and the policies and operating procedures governing investment managers.

- Monitor the investment performance of the Plan.

- Obtain, review and keep on file reports of investment performance, and the financial condition, receipts and disbursements of the Plan's assets.

- Appoint and retain individuals within the EIO to serve as fiduciaries to the Plan and carry out the functions enumerated above.

- Report to the Board.

39.     In addition to managing the assets of the Plan, the EIO was also charged with managing the assets of other trusts and benefit plans established by Exelon, including the pension plan, other defined contribution plans, employee benefit trusts, and the nuclear decommissioning trust.  In total, the EIO oversees over $43 billion in assets.

40.     The EIO had a Chief Investment Officer ("CIO") and three teams which oversaw investments in certain products: the public market team, the private market team, and the operations team.

41.     The public market team included the head of that section, two individuals focused on hedge funds and equities, and one on fixed income. The private market team included the head of that section, an analyst, an individual focused on private equity, and an individual focused on real estate and real assets. The operations team was comprised of three individuals.

42.     For investment portfolios under a certain size, the EIO had total discretion as to selection and/or termination of investment managers to manage those portfolios. Investment managers were reviewed and selected according to the EIO's manager approval process, which included the CIO and the heads of the three teams in the EIO. In selecting or replacing managers for portfolios over a certain size, the EIO needed to seek the approval of the Board and/or the CIC.

10

43.     Defendant Douglas J. Brown is a senior vice president and chief investment officer for Exelon.  During the Class Period he served as the head of the EIO and led the EIO in its management of all of the trust assets managed by Exelon, including the Plan. In this role, he was responsible for managing the governance of the Plan, including investment practices and funding. He was personally involved in the approval of any investment manager used by the Plan and was the architect of the current governance and investment structure for the Plan.

44.     Defendant Brown was responsible for the hiring, monitoring, and termination of other Exelon employees assigned to the EIO.

45.     Defendant Brown was a fiduciary of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority over manager or disposition of Plan assets.

46.     Jane and John Does 1-30 include any Exelon employee not otherwise individually named. They include Exelon employees assigned to the EIO who executed the fiduciary responsibilities to the Plan on Exelon's behalf with respect to selecting, monitoring, and maintaining investment options in the Plan, making asset allocation decisions, and providing periodic reports regarding the Plan's assets to the CIO, the CIC, and/or the Board, as well as the members of the CIC who approved investment strategies, allocations, and approved investments over a certain amount. They were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

**THE PLAN**

47.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provided for individual accounts

11

for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants that may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

48.     The Plan's original effective date was March 1, 1983. It has been amended and restated several times since, and it was formally renamed the Exelon Corporation Employee Savings Plan on March 30, 2001, when the PECO Energy Company Employee Savings Plan was merged with the Commonwealth Edison Company Savings Plan. Employees of Exelon and its subsidiaries are eligible to participate, usually within the first pay period of their employment, and are able to contribute between 1% and 50% of their eligible pay to the Plan.

49.     If an employee is enrolled in the Plan and fails to select any investment options, his or her contributions to the Plan will be automatically invested in the proprietary Target Date Fund that corresponds to the anticipated retirement date of that employee, which is based on the employee's birth date and an assumption that the employee will retire at age 61.

50.     The selection of target date funds as the Qualified Default Investment Alternative (the "QDIA") was made when target date funds within the Plan were managed by subsidiaries of the Vanguard Group, Inc. ("Vanguard"). When Defendants decided to replace the Vanguard target date funds with the current lineup of proprietary Target Date Funds in July 2014, the proprietary Target Date Funds became the QDIA in the Plan.

## CLASS ACTION ALLEGATIONS

51.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the proposed class (the "Class") defined as follows:

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan at

12

any time between December 6, 2015, and the date of judgment (the "Class Period").

52.     The members of the Class are so numerous that joinder of all members is impractical. The Class includes at least 40,000 people.

53.     Plaintiffs' claims are typical of the claims of the members of the Class, because Plaintiffs' claims, and the claims of all Class members, arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

54.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

        A.     Whether Defendants are fiduciaries of the Plan;

        B.     Whether Defendants breached their fiduciary duties of loyalty and prudence with respect to the Plan;

        C.     Whether Defendants breached their duty of loyalty by including investment options that worked to the detriment of the Plan's participants;

        D.     Whether Defendants failed to monitor the Plan's fiduciaries to ensure the Plan was being managed in compliance with ERISA; and

        E.     Whether the Plan fiduciaries breached their fiduciary duties in failing to comply with the provisions of ERISA set forth above.

55.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the

vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

56.    This action may be properly certified under either subsection of Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

57.    In the alternative, certification under Rule 23(b)(2) is warranted, because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS

58.    During the Class Period, each Defendant was a fiduciary of the Plan, either as a named fiduciary or as a *de facto* fiduciary with discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

59.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

60.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary

functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

61.     At all times relevant to this Complaint, Defendants were fiduciaries of the Plan, because:

    (a)     they were so named; and/or

    (b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

    (c)     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

    (d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

62.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

63.     Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration.  Rather, as set forth above, Defendants were

fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

64. During the Class Period, all of Defendants acted as fiduciaries of the Plan pursuant to ERISA § 3(21)(A), § 1002 (21)(A), and the law interpreting that section.

65. Exelon was and remains a fiduciary of the Plan, as a Plan Sponsor and as the Plan Administrator—through the Director of Employee Benefit Plans and Programs—for the entirety of the Class Period.

66. As Plan Administrator, Exelon exercised discretionary authority with respect to management and administration of the Plan and/or exercised authority or control over the management and disposition of the Plan's assets.

67. Instead of delegating fiduciary responsibility for the Plan, including the selection and monitoring of the investment options to external service providers, Exelon chose to internalize certain vital aspects of this function to the CIC and the EIO.

68. As noted above, Exelon acted through its Board of Directors and its employees in carrying out its duties as a named fiduciary or otherwise. Exelon had, at all times, effective control over the activities of its employees, appointed by Exelon to perform Plan-related fiduciary functions in the course and scope of their employment, including over their Plan-related activities.

69. By failing to properly discharge their fiduciary duties under ERISA, Defendants breached fiduciary duties they owned to the Plan, its participants and their beneficiaries. The individual Defendants were appointed by Exelon to perform Plan-related fiduciary functions in the course and scope of their employment. Accordingly, the actions of such employee fiduciaries are imputed to Exelon under the doctrine of *respondeat superior*, and Exelon is liable for these actions.

16

70.     ERISA mandates that Plan fiduciaries have a duty of loyalty to the Plan and its participants, which includes the duty to speak truthfully to the Plan and its participants when communicating with them.

71.     The duty of loyalty also includes a mandate that the fiduciary display complete loyalty to the beneficiaries and set aside the consideration of third persons. As noted in Advisory Opinion 88-16A by the Department of Labor:

> [I]n deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan.

1988 WL 222716, at *3 (Dec. 19, 1988).

72.     During the Class Period, Defendants acted to the detriment of the Plan and its participants and beneficiaries by including Plan investments that charged higher fees than alternative investments charged, either those provided by the same investment managers already included within the Plan, such as BlackRock and Vanguard, or by competitors.  Further, those investments also did not perform nearly as well as other options available on the market.

73.     Pursuant to 29 U.S.C. § 1104(a)(1)(B), ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments, as well as in the monitoring and minimization of administrative expenses.

74.     During the Class Period, Defendants, *inter alia*, selected and managed the Target Date Retirement Funds as both investment options and the default investment option despite their higher fees in comparison to  other similar products available in the marketplace and relatively poor performance, selected other funds as investment options despite their higher fees, selected and retained a recordkeeper that charged excessive fees for the services provided, and selected a

17

managed services provider that charged Plan participants unreasonable fees for the services provided.

## SUBSTANTIVE ALLEGATIONS

A. <u>**Overview**</u>

75.    Defendants made available to Plan participants various investment options during the Class Period, including:

- Target Date Funds

    o Target Retirement Income Fund

    o Target Retirement 2010 Fund

    o Target Retirement 2015 Fund

    o Target Retirement 2020 Fund

    o Target Retirement 2025 Fund

    o Target Retirement 2030 Fund

    o Target Retirement 2035 Fund

    o Target Retirement 2040 Fund

    o Target Retirement 2045 Fund

    o Target Retirement 2050 Fund

    o Target Retirement 2055 Fund

    o Target Retirement 2060 Fund

- Exelon Corporation Stock Fund

- Core Funds

    o U.S. Equity "Fund"

    o Blackrock U.S. Equity Index

- o International Equity "Fund"

- o Blackrock All Country World exUS

- o Fixed Income "Fund"

- o Blackrock U.S. Debt Index Fund

- o Northern Trust U.S. Government Money Market

- Expanded Choice Options

  - o BlackRock Large Cap Equity (Russell 1000) Growth Fund

  - o BlackRock Large Cap Equity (Russell 1000) Value Fund

  - o BlackRock Mid Cap Equity Index Fund

  - o Vanguard Mid Cap Equity Growth Index Fund

  - o Vanguard Mid Cap Equity Value Index Fund

  - o BlackRock Small Cap Equity (Russell 2000) Index Fund

  - o BlackRock Small Cap Equity (Russell 2000) Growth Fund

  - o BlackRock Small Cap Equity (Russell 2000) Value Fund

  - o BlackRock Developed International (MSCI EAFE) Equity Index Fund

  - o BlackRock Developed Intl (MSCI EAFE) Small Cap Equity Index Fund

  - o Vanguard Emerging Markets Equity Index Fund

  - o BlackRock All Country World (MSCI ACWI IMI)

  - o BlackRock Intermediate Government Bond Index Fund

  - o BlackRock U.S. Treasury Inflation Protected Securities Fund

  - o Vanguard Total International Bond Index Fund

  - o BlackRock Developed Real Estate Index Fund

76.     The investment options offered within large defined contribution plans like the Plan are often pooled and registered investment products known as mutual funds or funds-of-funds (which aggregate investments in various mutual funds). Each of these products in large defined contribution plans generally is subject to lower fees because of the large value of the assets under management. Prior to 2010, the Plan was almost exclusively dominated by fund-of-funds investment options.

77.     The Target Date Funds and three of the Core Funds—the U.S. Equity Fund, the International Equity Fund, and the Fixed Income Fund—are not registered investment products but instead daily priced funds with investments that are managed by multiple underlying investment managers. The selection of these managers and the allocation of assets among those managers for the Core Funds (the "Proprietary Funds") were and are the responsibility of Exelon, acting through the EIO. The EIO also selected the managers for the Target Date Funds and even though Exelon selected J.P. Morgan Investment Management Inc. to provide the allocation of assets, the allocation was constrained by the selection by the EIO of the managers of the underlying portfolios.

78.     As noted on the prospectuses distributed by the Plan, the Proprietary Funds are "not registered under the Securities Act of 1933" and are "exempt[] from investment company registration under the Investment Company Act of 1940," and "interests in the [funds] are not insured by the Federal Deposit Insurance Corporation (FDIC) or any other agency." As such, the "management of these funds is generally subject to regulation under [ERISA]."

79.     Each investment option within the Plan charges certain fees, to be paid by deductions from the pool of assets under management. For passively managed funds, which are designed to mimic a market index such as Standard & Poor's 500, securities were purchased to

match the mix of companies within the index. Because they are simply a mirror of an index, these funds offer both diversity of investment and comparatively low fees.

80. By contrast, actively managed funds, which have a mix of securities selected in the hope they will beat the market, have higher fees, presumably to account for the work of financial analysts. However, long-term data indicate that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over a 10-year period from 2004 to 2014." *See Index funds trounce actively managed funds: Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html.

81. In fact, one of the key findings of a Morningstar study was:

> Actively managed funds have generally underperformed their passive counterparts, especially over longer time horizons, and experienced high mortality rates (i.e. many are merged or closed). In addition, the report finds that failure tends to be positively correlated with fees (i.e. higher cost funds are more likely to underperform or be shuttered or merged away and lower-cost funds were likelier to survive and enjoyed greater odds of success).

*See* Morningstar's Active/Passive Barometer: A new yardstick for an old debate, at 2 (June 2015) available at http://corporate.morningstar.com/US/documents/ResearchPapers/MorningstarActive-PassiveBarometerJune2015.pdf.

82. These funds are a mix of underlying funds, most of which are actively managed, with investment managers selected by Exelon through the EIO.

**B.    Improper Management of an Employee Retirement Plan Can Cost the Plan's Participants Millions in Savings**

83. ERISA requires plan fiduciaries to provide diversified investment options for a defined-contribution plan. *See* 29 U.S.C. § 1104(a)(1)(C).

84. In addition to providing a diversified set of investment options for Plan participants, under 29 U.S.C. § 1104(a)(1)(C), a plan fiduciary must also ensure that the costs of these

investments are reasonable.  *See* U.S. Dep't of Labor, *A look at 401(k) Plan Fees*, (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").  This is because, as described by the Department of Labor, a one percent difference in fees and expenses can reduce a participant's retirement account balance by 28 percent over 35 years.  *Id.*

85.     In fact, the Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must: (1) "establish a prudent process for selecting investment options and service providers;" (2) "ensure that fees paid to service providers and other expenses of the plan are reasonable in light of the level and quality of services provided;" and (3) "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties.  *Id.*

86.     The duty to evaluate and monitor fees includes fees paid directly by Plan participants to investment providers, usually in the form of an expense ratio, or a percentage of assets under management within a particular investment.  *See* ICI, *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses* (August 2014), at 5.  "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants."  *Id*. at 6.

87.     Plan fiduciaries have a responsibility to take into account the reasonableness of any expense ratio when selecting a mutual fund or any other investment option for the Plan.

88.     On average, there are lower expense ratios for 401(k) participants than those for other investors. *See The Economics of Providing 401(k) Plans*, at 10. ERISA-mandated monitoring of investments requires plan sponsors, provided they are responsive to their fiduciary obligations, to evaluate performance and fees continually, which has resulted in fierce competition among

mutual funds in the marketplace. Furthermore, the large average account balances of 401(k) plans, especially those with over $1 billion in assets managed, can result in economies of scale and special pricing within mutual funds. *Id*.

89.     This has led to falling mutual fund expense ratios for 401(k) plan participants since 2000. In fact, these expense ratios have fallen 30 percent from 2000 to 2014 for equity funds, 24 percent for hybrid funds and 28 percent for bond funds. *Id*. at 1.

90.     The trend has continued in subsequent years, as demonstrated below.

FIGURE 7
**Average Mutual Fund Expense Ratios**
*Percent, 2015–2017*

| | 2015 | | 2016 | | 2017 | |
|---|---|---|---|---|---|---|
| | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] |
| **Equity mutual funds** | 0.67 | 0.51 | 0.63 | 0.48 | 0.59 | 0.45 |
| Domestic | 0.62 | 0.48 | 0.58 | 0.45 | 0.54 | 0.42 |
| World | 0.82 | 0.62 | 0.78 | 0.58 | 0.73 | 0.54 |
| **Hybrid mutual funds** | 0.77 | 0.54 | 0.73 | 0.53 | 0.70 | 0.51 |
| **Bond mutual funds** | 0.53 | 0.38 | 0.50 | 0.35 | 0.47 | 0.33 |
| Investment grade | 0.40 | 0.32 | 0.37 | 0.29 | 0.35 | 0.27 |
| World | 0.71 | 0.49 | 0.65 | 0.42 | 0.61 | 0.40 |
| Other taxable | 0.60 | 0.48 | 0.57 | 0.46 | 0.55 | 0.47 |
| **Money market funds** | 0.14 | 0.16 | 0.20 | 0.22 | 0.25 | 0.28 |

[1] The industry average expense ratio is measured as an asset-weighted average.

[2] The 401(k) average expense ratio is measured as a 401(k) asset-weighted average.

Note: Data exclude mutual funds available as investment choices in variable annuities and tax-exempt mutual funds.

Sources: Investment Company Institute, Lipper, and Morningstar

*See* ICI, *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2017*, at 11.[4]

*See also* Ted Godbout, *"Here's How Much 401(k) Plan Mutual Fund Expenses Ratios Have Dropped*, ASPPA.org, March 5, 2020 (available at

_____

[4] The notable exception to this is the money market funds, whose expense ratios rose after 2015. Because of the increased fees and the fact that investment in a money market fund does not increase materially in value, suffering the negative effects of inflation, many prudent fiduciaries removed money market funds from their Plans.

https://www.asppa.org/news/here%E2%80%99s-how-much-401k-plan-mutual-fund-expense-ratios-have-dropped) ("The cost of investing in equity and hybrid mutual funds through 401(k) plan fell again in 2019, continuing a downward trend that has persisted for nearly 20 years.")

91.     Moreover, these figures come from industry surveys of public pricing and do not reflect the ability of especially large institutional investors such as the Plan to command lower-than-published pricing, due to the size of the investments they are making. Often, such investors have access to custom funds with the same or similar strategies as publicly available funds for the lowest-published price, or even a lower price, simply because of the economies of scale that come with the ability to invest hundreds of millions of dollars in a single fund.

92.     Prudent plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, leveraging the size of their plan to ensure that well-performing, lower cost investment options are available to plan participants.

93.     This is especially critical because while higher-cost mutual funds may outperform a less-expensive option (such as a passively-managed index fund), over the short term, they rarely do so over a longer term. *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market? Hardly*, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year). Conversely, mutual funds with the worst performance tend to continue to perform poorly in the future.  Jonathan B. Berk, Jing Xu, *Persistence and Fund Flows of the Worst Performing Mutual Funds*,                at                6                (2004)                available                at http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.421.2127&rep=rep1&type=pdf

24

(attributing continuing poor mutual fund performance to less responsive investors who do not pull their capital from the funds, causing the fund manager to change strategies).

94.     As a result, plan fiduciaries such as Defendants here must be continually mindful of the performance and cost of plan investment options to avoid undue risk to plan participants' savings and to ensure that any fees paid are reasonable compensation for the services provided. This includes fees from any plan service provider, including the plan fiduciaries themselves.

95.     Plan fiduciaries must also be aware of the particular share class of the mutual fund available to institutional investors, like 401(k) plans, as certain shares can have lower fees than others. A lower fee is usually predicated on a larger investment, *e.g.*, the lower fee class of share is available only to those who invest more money in the mutual fund. Thus, for the same investment with the same manager, the fee can vary by 50 basis points or more between the retail share and the institutional share.

96.     Plan fiduciaries must also be wary of conflicts of interest that arise when plan administrators and other fiduciaries select investment options for the plan which include a remittance of a fee to the plan sponsor, administrator, or investment advisor, or another party otherwise affiliated with the plan sponsor.  The inherent conflict of interest in such situations can cause affiliated funds to be selected and retained when they are not the most prudent investment option and when they demonstrate poor performance.

97.     In fact, one Pension Research Council working paper found in a study of such situations that "[a]ffiliated funds are more likely to be added and less likely to be removed from 401(k) plans," especially for the worst performing funds.  *See* Veronika Pool, Clemons Sialm, and Irina Stefenescu, *It Pays to Set the Menu: Mutual Fund investment Options in 401(k) Plans*, at 2 (May 2015).  Moreover, even though plan participants may be aware of the affiliation, due to their

25

naivety in investments and general inactivity in changing those investments, the study found "participants are not generally sensitive to poor performance and thus they do not undo the trustee bias." *Id*. at 3.

98.     "[A]ffiliated funds that rank poorly based on past performance but are not deleted from the menu do not perform well in the subsequent year," and thus, "the decision to retain poorly-performing affiliated funds is not driven by information about the future performance of these funds." *Id*. at 3, 26.

99.     Given the vulnerability of plan participants, who are dependent on the retirement income earned by their plan investment choices, plan fiduciaries must be particularly vigilant about the selection and maintenance of affiliated funds in their 401(k) plans.

100.     During the Class Period, the Plan was dominated by actively managed funds. Of the 36 investment options in the Plan, 21 were actively managed. Of the remaining options, one is the money market account, which is run by an affiliate of the Plan's trustee, and another is the Exelon Corporation Stock Fund.

101.     And while the Plan does include some "Expanded Choice" investments, many Plan participants are unable to invest in those investments, because they are not shown as options when Plan participants log into their accounts. Indeed, prior to 2018, these "Expanded Choice" investments were not even shown on the quarterly statements, which displayed all other investment options in the Plan whether a Plan participant had invested in them or not. In order to view these "Expanded Choice" investment options and possibly select them, Plan participants have to actively seek them out, and some are even forced to sign paperwork to get access to those options. This has the effect of steering Plan participants' investment decisions towards the Proprietary Funds.

102.    Because the Plan assets are invested through use of a Master Trust, Defendants
have not disclosed the exact amounts of the Plan's assets that are invested in particular investment
options.  However, the majority of assets in the Plan are invested in the Proprietary Funds,
including the Target Date Funds.

103.    Around the same time that Defendants replaced certain investment options with
Proprietary Funds, Defendants also replaced the Plan's recordkeeper, Aon, and retained Northwest
Plan Services, Inc. ("Northwest") in partnership with Edelman Financial Engines, formerly known
as Financial Engines, Inc. ("FE").  Under this arrangement, Northwest would provide
recordkeeping and associated administrative services, while FE would provide managed account
services to Plan participants.

## C.      Defendants' Breaches of Fiduciary Duty

### (1)      Defendants Breached Their Fiduciary Duties by Including Investment Options that Imposed Higher Fees and Performed No Better or Even Worse than Market Alternatives

104.    The Supreme Court reaffirmed the ongoing fiduciary duty to monitor a plan's
investment options in *Tibble v. Edison, Int'l*, 135 S. Ct. 1823 (2015). *Tibble* held that "an ERISA
fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee
has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828. In so
holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act ("UPIA"),
treatises, and seminal decisions confirming the duty.

105.    The UPIA enshrines trust law and recognizes that "the duty of prudent investing
applies both to investing and managing trust assets. . . ." 135 S. Ct. at 1828 (quoting Nat'l
Conference of Comm'rs on Uniform State Laws, UPIA § 2(c) (1994)). The official comment
explains that "'[m]anaging' embraces monitoring, that is, the trustee's continuing responsibility

for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id*. § 2 comment.

106.     As similarly summarized in the Third Restatement: "***Changes in a company's circumstances, adaptation to trust- and capital-market developments***, fine-tuning, and the like may, of course, justify the selling and buying of properties as an aspect of a prudent plan of asset allocation and diversification . . . .  This is consistent with the trustee's ongoing duty to monitor investments and to make portfolio adjustments if and as appropriate, with attention to all relevant considerations, including tax consequences and other costs associated with such transactions." Restatement (Third) § 90 comment e(1) (emphasis added).

107.     As described above, one of the responsibilities of plan fiduciaries is to select investment options that have reasonable and not excessive fees for the performance and quality of service received, and to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007).  *See also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to produce in the investment function.")  Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in the plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings.  *See Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

108.     As the amount of assets under management approaches and exceeds $1 billion, the economies of scale dictate that lower and lower cost investment options will be available to these plans.  When large plans, particularly those with over $1 billion in assets, have options that

28

approach the retail cost of fund shares for individual investors or are simply more expensive than the average institutional fund shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

109. In 2014, Defendants replaced Vanguard Target Date Retirement funds in the Plan with the Target Date Funds. While Vanguard Target Date Retirement funds are well-performing and among the lowest cost funds, there are many other options with similar performance and low expense ratios on the market, including options from BlackRock, State Street, Charles Schwab, and Fidelity, to name a few.

110. Similarly, Defendants replaced other options in the Plan with actively-managed Proprietary Funds in the Fixed Income, U.S. Equity, and International Equity spaces. Again, providers abound in the marketplace that offer lower-costing alternatives, including Vanguard, BlackRock, State Street, and Fidelity, among others.

111. The table below shows the expense ratios in 2019 for the Proprietary Funds compared to alternatives with substantially similar investment mixes and with the same or better performance.

| **Investment Option** | **Fee** | **Alternative Options** | **Fee** | **Potential Savings to Class** |
|---|---|---|---|---|
| Target Retirement Income Fund | 0.30 | BlackRock LifePath Index Retire Instl | 0.12 | 0.18 |
| | | Vanguard Instl Retire Instl | 0.09[5] | 0.21 |
| | | State Street Target Retirement K | 0.09 | 0.21 |

---

[5] Both BlackRock and Vanguard offer the funds shown in this table with non-institutional share classes, as opposed to the institutional share classes shown in the table. Because of the amount of the Plan's assets, these institutional share classes would have been available to the Plan. In comparison to institutional classes, the retail classes' expense ratio is higher, usually between 6 and 7 basis points higher for BlackRock and 5 basis points higher for Vanguard. These higher prices are still lower than the expense ratios for the comparable EIO-managed funds.

| | | | | |
|---|---|---|---|---|
| Target Retirement 2010 Fund | 0.30 | Vanguard Instl Target Retirement 2010 | 0.09 | 0.21 |
| | | State Street Target Retirement 2010 Index | 0.17 | 0.13 |
| Target Retirement 2015 | 0.31 | Vanguard Instl Target Retirement 2015 | .09 | 0.22 |
| | | BlackRock LifePath Index 2015 | .22 | 0.09 |
| | | State Street Target Retirement 2015 Non-Lending Series | .17 | 0.14 |
| Target Retirement 2020 | 0.32 | BlackRock LifePath Index 2020 Instl | 0.15 | 0.17 |
| | | Vanguard Instl Target Retire 2020 | 0.09 | 0.23 |
| | | State Street Target Retirement 2020 K | 0.09 | 0.23 |
| Target Retirement 2025 | 0.33 | Vanguard Instl Target Retirement 2025 | 0.09 | 0.24 |
| | | BlackRock LifePath Index 2025 Instl | 0.14 | 0.19 |
| | | State Street Target Retirement 2025 K | 0.09 | 0.24 |
| Target Retirement 2030 | 0.34 | Vanguard Instl Target Retirement 2020 | 0.09 | 0.25 |
| | | BlackRock LifePath Index 2030 Instl | 0.14 | 0.20 |
| | | State Street Target Retirement 2030 K | 0.09 | 0.25 |
| Target Retirement 2035 | 0.35 | Vanguard Instl Target Retirement 2035 | 0.09 | 0.26 |
| | | BlackRock LifePath Index 2035 Instl | 0.14 | 0.21 |
| | | State Street Target Retirement 2035 K | 0.09 | 0.26 |
| Target Retirement 2040 | 0.36 | Vanguard Instl Target Retirement 2040 | 0.09 | 0.27 |
| | | BlackRock LifePath Index 2040 Instl | 0.14 | 0.22 |
| | | State Street Target Retirement 2040 K | 0.09 | 0.27 |
| Target Retirement 2045 | 0.36 | Vanguard Instl Target Retirement 2045 | 0.09 | 0.27 |
| | | BlackRock LifePath Index 2045 Instl | 0.14 | 0.22 |
| | | State Street Target Retirement 2045 K | 0.09 | 0.27 |
| Target Retirement 2050 | 0.36 | Vanguard Instl Target Retirement 2050 | 0.09 | 0.27 |
| | | BlackRock LifePath Index 2050 Instl | 0.14 | 0.22 |

| | | State Street Target Retirement 2050 K | 0.09 | 0.27 |
|---|---|---|---|---|
| Target Retirement 2055 | 0.37 | Vanguard Instl Target Retirement 2055 | 0.09 | 0.28 |
| | | BlackRock LifePath Index 2055 Instl | 0.14 | 0.23 |
| | | State Street Target Retirement 2055 K | 0.09 | 0.28 |
| Target Retirement 2060 | 0.37 | Vanguard Instl Target Retirement 2060 | 0.09 | 0.28 |
| | | BlackRock LifePath Index 2060 Instl | 0.14 | 0.23 |
| | | State Street Target Retirement 2060 K | 0.09 | 0.28 |
| U.S. Equity Fund | 0.21 | Vanguard Russell 1000 Index Fund Instl | 0.07 | 0.14 |
| | | Vanguard Russell 2000 Index Fund Instl | 0.08 | 0.13 |
| | | BlackRock Russell 2000 T | 0.06 | 0.15 |
| International Equity Fund | 0.36 | State Street Glob All Cap Eq ex-US | 0.065 | 0.295 |
| | | Vanguard FTSE All-World ex-US Index | 0.06 | 0.30 |
| Fixed Income Fund | 0.19 | Fidelity US Bond Index | 0.025 | 0.165 |
| | | Vanguard Total Bond Market Index Fund | 0.14 | .05 |

112.    As shown above, the expense ratios of the Proprietary Funds are significantly higher than comparators.  Further, the performance of the Proprietary Funds is not better than the comparators, which have substantially similar investment strategies and underlying assets, as demonstrated by the below charts (measuring performance as of September 30, 2020).[6]

---

[6] Indeed, while many of the fees of these Plan investment options decreased in the following year, they did so by only two to three basis points in most cases.  One option's fees, the Fixed Income Fund, actually increased by 1 basis point.







113.    Further, investment managers are receptive to negotiating rates lower than their public rates with plans whose assets exceed $1 billion, especially as those plans grow into multi-billion-dollar plans.  As such, Defendants were in a position to command the best rates to secure some of the best performing options in the marketplace.

114.    Instead, Defendants directed or allowed Exelon, through the EIO, to construct the Proprietary Funds, 15 unregistered investment options that mirror the investment strategies of actively managed funds available in the marketplace, despite the facts that: (1) actively managed investment options rarely outperform passively managed ones over time; and (2) the fees charged for the Proprietary Funds were significantly higher than those for actively managed funds available in the marketplace.

115.    As a result of including and maintaining the Proprietary Funds, Defendants caused Plan participants to lose millions of dollars, both to expensive investment management fees and poorer performance.

116.    Indeed, if Exelon had conducted a proper survey of the marketplace during the Class Period, it would have seen that Plan investment option fees were higher than passively managed options and that the performance of these Plan investment options was significantly worse than both passively and actively managed options. As a result, rather than pay slightly more for performance that more than made up for its higher cost, or pay less and receive higher performance, Exelon instead chose higher costs for worse performance.

**(2)     Defendants Breached Their Fiduciary Duties to Monitor Recordkeeping and Administrative Expenses**

117.    Recordkeeping and related administrative ("RK&A") services are necessary for all defined contribution plans. These services include, but are not limited to, those related to maintaining plan records, tracking participant account balances and investment elections, transaction processing, call center support, participant communications, and trust and custody services. At all time during the Class Period, Defendants received a standard package of RK&A services.

118.    Third-party service providers, often known as "recordkeepers," provide RK&A services on behalf of a defined contribution plan. Some recordkeepers provide only recordkeeping and related services, and some recordkeepers are subsidiaries of financial services and insurance companies that distribute mutual funds, insurance products, and other investment options.

119.    The market for defined contribution recordkeeping services is highly competitive, particularly for a plan, like the Plan, with large numbers of participants and large amounts of assets.

120.    Since at least the mid-2000s, the fee that RK&A service providers have been willing to accept for providing RK&A services has decreased.

34

121. The underlying cost to a recordkeeper of providing RK&A services to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan.

122. The incremental cost for a recordkeeper to provide RK&A services for a participant's account does not materially differ from one participant to another; it is generally not dependent on the balance of the participant's account.

123. Recordkeepers for relatively larger defined contribution plans, like the Plan, experience certain efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants increases, because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans. When the number of participants with an account balance increases in a defined contribution plan, the recordkeeper is able to spread the cost of providing recordkeeping services over a larger participant base, thereby reducing the unit cost of delivering services on a per-participant basis.

124. Therefore, while the total cost to a provider for RK&A services increases as more participants join the Plan, the cost per participant to deliver the services decreases. Since at least the early 2000s, plan fiduciaries, including Defendants, along with their consultants and advisors, have been aware or should have been aware of this cost structure dynamic for RK&A providers.

125. Sponsors of defined contribution plans often contract for RK&A services separately from any contracts related to the provision of investment services or options to plan participants.

126. RK&A service providers often make separate contractual arrangements with investment providers. For example, RK&A providers often collect a portion of the total expense ratio fee of the mutual fund. This is known as "revenue sharing."

127.     However, a RK&A provider receives its compensation, whether through direct payments, indirect compensation such revenue sharing, or a combination of both, the plan fiduciaries must ensure that the that the total compensation received by the provider is reasonable for the services provided.  In order to determine reasonability, plan fiduciaries must understand the total dollar amounts being paid to the RK&A provider as well as understanding the marketplace rates for the RK&A services received by the plan.

128.     The fees paid to recordkeepers should be evaluated and compared by the plan fiduciaries on a dollar per participant basis, because the compensation can come from multiple sources, as described above.

129.     A plan with more participants can and should receive a lower effective per participant fee than a smaller plan.  This is well-known among retirement plan professionals, including service providers.

130.     Prudent plan fiduciaries ensure that the plans are paying only reasonable fees for RK&A services by soliciting competitive bids from several service providers to perform the same services currently being provided to the plan.  This is not a difficult or complex process, and prudent plan fiduciaries perform it regularly.  Plan fiduciaries need only request a bid, a request for proposal ("RFP"), from salespeople at other service providers.  For plans with as many participants as the Plan, most recordkeepers would require only the number of participants to provide a quote.  At all times, plan fiduciaries have all of this information readily available and can easily obtain a quote from other service providers to determine if the current level of fees is reasonable.

131.     By going through an RPF process every few years, the prudent plan fiduciary can review the level of service provided by the recordkeeper and compare fees in the marketplace to

those being offered by the current recordkeeper. This also allows the plan fiduciary to negotiate with its current provider for a lower fee and/or move to a new provider to provide the same or better services for a more competitive and reasonable fee.

132.    Plan fiduciaries also decide how to pay the negotiated fee for recordkeeping services. While the employer or the plan sponsor can pay the recordkeeping fee on behalf of participants, most choose instead to pass on the fee to Plan participants. When the recordkeeping fee is paid by plan participants, the plan fiduciary can allocate the negotiated recordkeeping fee among participant accounts at the negotiated per-participant rate, or pro-rata based on account values, among other less common ways.

133.    In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the Plan. This structure creates situations in which the RK&A services provided by the recordkeeper do not change but, because of market appreciation, as well as additional contributions to the plan, the revenue received by the recordkeeper increases. This structure is preferred by recordkeepers, because it allows the recordkeeper to obtain an increase in revenue without having to ask the client to take affirmative steps to pay a higher fee, and without the recordkeeper having to do additional work.

134.    Regardless of the pricing structure negotiated by the plan fiduciary, the fiduciary must ensure that the fee paid to the recordkeeper for RK&A services is reasonable for the level of services provided.

135.    Fiduciary best practices, based on DOL guidelines, case law, and marketplace experience, are known or should be known to Defendants. These practices are:

- Price administrative fees on a per-participant basis.

- Benchmark and negotiate recordkeeping and investment fees separately.

- Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size.

- Benchmark and negotiate recordkeeping and trustee fees at least every other year.

- Review services annually to identify opportunities to reduce administrative costs.[7]

136.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs.  *See Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the Plan); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

137.    First, a plan fiduciary must pay close attention to the recordkeeping fees being paid by the plan. A prudent fiduciary tracks fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

138.    Second, to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

---

[7] "Fiduciary Best Practices," *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance,* Mercer Investment Consulting (2013).

139.     Third, a plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, particularly comparably sized plans, as well the recordkeeping rates that are or may be available to the plan.  This will generally include conducting an RFP process at reasonable intervals, and immediately upon discovery that a plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three (3) years as a matter of course, and more frequently if the plan experiences an increase in recordkeeping costs or if every-other-year fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans.

140.     By merely soliciting bids from other providers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for similar RK&A services and have an idea of a starting point for negotiation.  Accordingly, the only way to determine the true market price at any given time is to obtain competitive bids through some process.  *See Kraft Foods*, 641 F.3d at 800 (failure to solicit bids, and higher-than-market recordkeeping fees, supported triable fiduciary breach claim).

141.     A plan fiduciary must continuously monitor its RK&A fees by regularly soliciting competitive bids to ensure fees paid to covered service providers (such as recordkeepers) are reasonable.

142.     During the Class Period, Defendants knew or should have known that a plan with more participants, such as the Plan, can receive a lower effective per participant fee when evaluated on a per participant basis.  Defendant also knew or should have known that the Plan should have received lower effective per participant fees than were actually paid.

39

143.    During the Class Period, Defendants knew or should have known that they must regularly monitor the Plan's RK&A fees paid to covered service providers, including but not limited to Northwest.

144.    During the Class Period, Defendants failed to prudently and effectively monitor the Plan's RK&A fees paid to covered service providers, including but not limited to Northwest.

145.    During the Class Period, Defendants knew or should have known that they must regularly solicit quotes and/or competitive bids from covered service providers, including but not limited to Northwest, in order to avoid paying objectively unreasonable fees for RK&A services.

146.    During the Class Period, Defendants knew or should have known that it was in the best interests of the Plan's participants to ensure that the Plan paid no more than a competitive and reasonable fee for the RK&A services.

147.    During the Class Period, and unlike a prudent fiduciary, Defendants failed to ensure that the Plan paid no more than a competitive, reasonable fee for RK&A services.

148.    During the Class Period, and unlike a prudent fiduciary, Defendants did not have a process in place to ensure that the Plan paid no more than a competitive reasonable fee for RK&A services.  Alternatively, to the extent there was a process in place that Defendants followed, they acted ineffectively, given the objectively unreasonable fees paid for RK&A services.

149.    During the Class Period, and unlike a prudent fiduciary, Defendants did not engage in any objectively reasonable and/or prudent efforts to ensure that the Plan paid no more than a competitive reasonable fee for RK&A services.

150.    During the Class Period, because Defendants failed to prudently and effectively monitor the Plan's RK&A fees paid to covered service providers, including but not limited to

Northwest, the Plan's RK&A service fees were significantly higher than they would have been had Defendants engaged in this process.

151.    During the Class Period, because Defendants did not regularly, prudently and effectively solicit quotes and/or competitive bids from covered service providers, including but not limited to Northwest, the Plan's RK&A service fees were significantly higher than they would have been had Defendants engaged in these processes.  Alternatively, to the extent there was a process in place that Defendants followed, Defendants acted ineffectively, given the objectively unreasonable fees paid for RK&A services.

152.    During the Class Period, because Defendants did not engage in any objectively reasonable and/or prudent efforts when paying fees for RK&A services to covered service providers, including but not limited to Northwest, these RK&A service fees were significantly higher than they would have been had Defendants engaged in these efforts.

153.    For the years 2015 through 2019, based upon the information available to Plaintiffs, which was equally or even more easily available to Defendants during the Class Period, the table below shows the annual RK&A fees in the aggregate and on a per participant basis, the table illustrates that the Plan had on average 37,804 participants and paid an average RK&A fee of at least approximately $3,772,212 per year, which equates to an average of at least approximately $99.78 per participant.  These are the minimum amounts that could have been paid, and these amounts are only those that were paid to the recordkeeper.

| Recordkeeping and Administration (RK&A) Fees Paid to the Recordkeeper | | | | | | |
|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | Average |
| **Participants** | 33,950 | 34,829 | 36,007 | 41,940 | 42,294 | 37,804 |
| **RK&A Fees** | $7,446,046 | $3,006,571 | $2,391,630 | $3,077,744 | $2,939,070 | $3,772,212 |
| **Fees/Participant** | $219.32 | $86.32 | $66.42 | $73.38 | $69.49 | $99.78 |

154.    From the years 2015 through 2019, based upon the information available to Plaintiffs, which was equally or even more easily available to Defendants during the Class Period, it was possible for the Plan to negotiate RK&A fees for not more than between $20 and $35 per participant.  The table below illustrates that the annual RK&A fees to recordkeepers by comparable plans of similar sizes of assets under management in 2018, compared to the average annual RK&A fees paid by the Plan (as identified in the table above).  Even in the year the Plan paid the least on a per participant basis, or $66.42 per participant, the Plan's RK&A fees are much higher than the fees paid by other Plans.

| Comparable Plans' RK&A Fees from Recordkeepers in 2018[8] | | | | | |
|---|---|---|---|---|---|
| **Plan** | **Participants** | **Assets** | **RK&A Price** | **Per Participant Fee** | **Recordkeeper** |
| **Exelon Corporation Employee Savings Plan** | **41,940** | **$8,481,316,328** | **$3,077,744** | **$73** | **NorthWest** |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity |
| The Tax Sheltered Annity Plan of Texas Children's Hospital | 13,950 | $993,649,270 | $416,395 | $30 | Fidelity |
| DHL Retirement Savings Plan | 14,472 | $806,883,596 | $483,191 | $33 | Fidelity |

---

[8] Price calculations are based on Form 5500 information filed by the respective plans for the year 2018, if available or more recent year if not available.

| Dollar General Corp. 401(k) Savings and Retirement Plan | 16,125 | $355,768,325 | $516,000 | $32 | Voya |
|---|---|---|---|---|---|
| Sanofi U.S. Group Savings Plan | 24,097 | $5,522,720,874 | $558,527 | $23 | T. Rowe Price |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $1,040,153 | $33 | Alight |
| Kindred 401(k) | 34,092 | $1,299,328,331 | $1,121,564 | $33 | T. Rowe Price |
| The Savings and Investment Plan | 34,303 | $2,682,563,818 | $1,130,643 | $33 | Vanguard |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | $3,104,524,321 | $1,298,775 | $27 | Vanguard |
| Sutter Health 403(B) Savings Plan | 73,358 | $3,681,162,013 | $1,908,133 | $26 | Fidelity |
| Google LLC 401(K) Savings Plan | 82,725 | $11,786,824,293 | $1,676,414 | $20 | Vanguard |
| Raytheon Savings and Investment Plan | 82,788 | $17,243,679,305 | $2,292,583 | $28 | Fidelity |

155. The information above also illustrates that even to the extent the Plan fiduciaries did undertake a review of the Plan's RK&A expenses, the process they used to evaluate fees was so deeply flawed that Plan participants continued to pay between *2 to 4 times* what they should have been for identical or substantially similar RK&A services.

156. From the years 2015 through 2019, based upon the information available to Plaintiffs, which was equally or even more easily available to Defendants during the Class Period, had Defendants been acting in the exclusive best interest of the Plan and/or employed a robust process to gather appropriate information and evaluate RK&A fees and services, the Plan would have paid significantly less than an average of $3,772,212 per year in RK&A fees, or approximately $99 per participant.

157. If Defendants had been acting in the exclusive best interest of the Plan and/or employed a robust process to gather appropriate information and evaluate RK&A fees and services, the Plan would have paid between $20-$35 per participant per year during the Class Period for RK&A services.

158.    From the years 2015 through 2019, based upon the information available to Plaintiffs, which was equally or even more easily available to Defendants during the Class Period, the Plan cost its Participants approximately $18,861,061 in RK&A fees just to its recordkeeper. As a result, the Defendants caused Plan Participants to pay a total minimum amount of approximately $11 million to $15 million in unreasonable and excess RK&A fees for the services the Plan received from the recordkeepers.

159.    During the entirety of the Class Period, and unlike a prudent fiduciary, Defendants did not regularly and/or reasonably assess the Plan's RK&A fees it paid to its recordkeepers, and did not engage in regular and/or reasonable examination and competitive comparisons of the RK&A fees paid to its recordkeepers *vis-à-vis* the fees that other RK&A providers would charge for the same services.

160.    During the entirety of the Class Period, Defendants knew or had knowledge that they must engage in regular and/or reasonable examination and competitive comparison of the Plan's RK&A fees, but discovery will show Defendants simply failed to do so.

161.    Had Defendants engaged in any regular and/or reasonable examination and competitive comparison of the RK&A fees the Plan paid, they would have realized that the Plan was compensating the recordkeepers unreasonably and inappropriately for the Plan's size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and the Plan Participants.  The fees were also excessive relative to the RK&A services received.

162.    During the entirety of the Class Period, by failing to recognize that the Plan and its participants were being charged much higher RK&A fees than they should have been charged and/or by failing to take effective remedial actions as described herein, Defendants breached their fiduciary duties to Plaintiffs and the Plan Participants.

**(3)     Defendants Breached Their Fiduciary Duty to Monitor Managed Account Services Expenses**

163.    Plan fiduciaries of defined contribution plans have a continuing and regular responsibility to select and monitor all investment options they make available to plan participants, as well as the fees for service providers who work directly with plan participants with respect to services such as managed account services.

164.    For managed account services, the participant pays a fee to have his or her account invested in a portfolio of pre-selected investment options available in the plan. Managed account providers "generally offer the same basic service—initial and ongoing investment management of a 401(k) plan participant's account based on generally accepted industry methods." The United States Government Accountability Office ("GAO"), *401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts*, at 14 (June 2014), available at https://www.gao.gov/assets/670/664391.pdf. Assets are generally managed based upon a program designed by the managed account provider that customizes the participant's portfolio based upon factors such as the participant's risk tolerance and the number of years before retirement.

165.    Participants who sign up for managed account services are generally charged an annual fee that is a percentage of the individual's account balance. Typically, though not always, the pricing is tiered. For example, the first $50,000 of assets may be charged a certain fee level, the next $150,00 in assets at a lower level, and all remaining assets at a still-lover level.

166.    The participants have no control over the rate they are charged—fee levels are determined at the plan level through a contractual agreement between the managed account provider and the fiduciaries of the plan. When managed account services were first introduced roughly 25 years ago, these fees were generally fixed by either the managed account provider or the recordkeeper, leaving little room for negotiation. However, for at least the past 10 years, larger

plans have been able to negotiate several facets of the fees charged by managed account providers. This includes both the asset levels at which particular tiers start (i.e., the highest fee tier applies to the first $25,000 versus the first $100,000) as well as the percentage charged at each fee level.

167.    As with any service provider, one of the most important factors when selecting a managed account provider is fees.  Managed account services have historically been expensive compared to other alternatives, such as target date funds.  But, in recent years, a number of managed account service providers such as Fidelity and Morningstar have emerged that are capable of providing a high level of managed account services at competitive rates.  As this industry segment has matured over the past decade, expenses have declined, and competition has increased.  As a result, fees for managed account services have been declining for a number of years.

168.    As with recordkeeping services, prudent fiduciaries will regularly monitor the amount of managed account service fees the plan is paying and will conduct periodic cost benchmarking to determine whether those amounts are consistent with the amount paid by other similarly situated plans.  As with recordkeeping, if the benchmarking analysis demonstrates that the plan is paying higher fees than other similarly situated plans, a prudent fiduciary will solicit bids from other managed account service providers.

169.    Since at least 2016, Defendants have retained Northwest in partnership with FE—one of the largest managed account service providers in the industry—to provide managed account services to Plan participants.

170.    During the Class Period, Defendants made available to Plan Participants two managed account services provided by FE: the Management program and the Personal Advisor program.

46

171.    For the Management program, FE manages the retirement account on behalf of the participant.  FE uses a proprietary algorithm which mimics the investment pattern of a target date fund, using a participant's birthday to select a target date for retirement and adjusting the mix of equity and other assets to lower the risk profile of the participant's portfolio as the retirement date nears. For the Management program, Defendants have allowed Plan Participants to be charged an annual fee of 0.45% on the first $100,00, 0.40% on the next $150,000, and 0.30% on assets over $250,000.  This service is not dissimilar from a previous service offered by the Plan in 2014 for online advice, which was provided without cost to Plan Participants.

172.    For the Personal Advisor program, Plan Participants work with a dedicated advisor who advises the Plan Participant on his or her entire financial portfolio, including other retirement accounts.  Defendants have allowed Plan Participants to be charged an annual fee of 0.95% on the first $100,00, 0.90% on the next $150,000, and 0.85% on asset over $250,000 for these services.

173.    Fees for FE services are calculated based on the average amount of assets under management for the calendar quarter and are debited from the Plan Participant's account at the start of the following quarter.

174.    It is difficult for Plan Participants to obtain marketplace data, because companies are not required to publicly disclose the fee rates they charge for managed account services. However, the below illustrates the fee rates paid by similarly situated plans for similar or identical managed account services to the Management program.

175.    The asset levels required to achieve a lower fee tier are higher for Plan participants than for participants in other similarly situated plans.  For example, as of 2019, participants in Comcast's 401(k) plan pays no fees on their first $25,000, 0.30% on the next $225,00, and 0.20% on the remainder.  Participants in Marsh & McLennan Companies pay 0.30% on the first $100,00,

0.25% on next $150,000, and 0.15% on the remainder. For participants in the Sodexo 401(k) plan, they reach the lowest level of fee, 0.30%, at only $150,000 in assets under management.

176.    Furthermore, there are a number of other managed account providers whose services are virtually identical to the services provided to Plan participants through the Management program service and whose fees range from 0.25% to 0.30% on all assets, e.g., Betterment, Vanguard, and Charles Schwab, for plans much smaller than the Plan.

177.    Thus, the fee rates paid by the Plan Participants for the Management program were excessive and unreasonable given the Plan's size and negotiating power.

178.    Moreover, the Plan's Management program service added no material value to participants to warrant the additional fees. The asset allocation created by the service was not materially different than the asset allocation of the age-appropriate target date option made available to the Plan's Participants at a lower fee.

179.    As a result, based on the value provided, the reasonable fee for the Plan's Management program service was zero or very close to zero.

180.    Defendants did not prudently evaluate the incremental value provided by FE via its managed account services to determine that the fees were warranted.

181.    A prudent fiduciary would have conducted periodic cost benchmarking and take other measures (including issuing an RFP, if necessary), as well as evaluating the incremental value provided to Plan Participants, to ensure that the amount paid by the Plan for managed account services was reasonable. Had Defendants done so, the Plan would not have paid the excessive managed account service fees that it did.

182.    Based on the excessive amounts paid by the Plan for managed account services, it is reasonable to infer that Defendants failed to prudently monitor and manage the Plan's managed

account services. Defendants' failure to properly monitor or control fees for the Plan's managed account service cost resulted in Plan Participants paying excessive and unreasonable fees and constitutes a separate and independent breach of fiduciary duty.

183.    Based upon public information, between its introduction as an option in the Plan and the end of 2019, FE has collected over $7.6 million in fees from Plan Participants. These fees are excessive and unreasonable for the services FE provided to Plan Participants.

184.    FE often shares with a plan's recordkeeper half of more of the revenue collected from a plan, and, as such, its standard fees are set to take that revenue-sharing into account. Defendants have not indicated in any Form 5500 that Northwest receives any indirect compensation at all, much less half or more of the revenue that FE collects. Accordingly, either Defendants have failed to disclose to whom FE is remitting half or more of its charges, or FE is keeping for itself all of the excessive fees it charges Plan participants. In the event that FE has been remitting half or more of its charges to the recordkeeper, then: a) the recordkeeper's compensation is even more excessive than described in the preceding section of this complaint; and b) Defendants have failed to bargain material reductions in the recordkeeper's direct compensation on the basis of the indirect compensation Defendants knew or should have known the recordkeeper has been receiving from FE. In the event that FE has been keeping for itself all or virtually all of its charges for itself, FE's fees for the services it has performed are grossly excessive.

## CAUSATION

185.    The Plan suffered millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in the Proprietary Funds

during the Class Period, in breach of Defendants' fiduciary duties, as reflected in the diminished account balances of the Plan's participants.

186.    Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and its participants would have avoided a substantial portion of the losses that they suffered through the Plan's continued investment in the Proprietary Funds.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

187.    As noted above, as a consequence of Defendants' breaches, the Plan suffered significant losses.

188.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

189.    Plaintiffs, the Plan, and the Class are therefore entitled to relief from Defendants in the form of: (1) monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

190.    Each Defendant is jointly liable for the acts of the other Defendants as co-fiduciary.

50

## CLAIMS FOR RELIEF UNDER ERISA

191.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

192.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

193.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

194.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides in pertinent part, that a fiduciary shall discharge his duties with respect to plan solely in the interest of the participants and their beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiarity with such matters would use in the conduct of an enterprise of a like character and with like aims.

195.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Braden v. Wal-Mart Stores, Inc.,* 588 F. 3d 585, 598 (8th Cir. 2009) (citation omitted). They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into, and continually to monitor the merits of all the investment alternatives to a plan;

(b)    A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

(c)    A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform then the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

196.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

197.    Plaintiffs therefore bring this action under the authority of ERISA §502(a) for Plan-wide relief under ERISA §409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

**FIRST CLAIM FOR RELIEF**
**Failure to Prudently and Loyally Manage the Plan's Assets**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)**

198.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

199.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

200.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments available to the Plan participants were prudent and that such investments were consistent with the purpose of the Plan.  Defendants are liable for losses and excessive fees incurred as a result of such investments being imprudent.

201.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

202.    Moreover, ERISA § 404 (a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty, that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

203.    Defendants' duty of loyalty and prudence obligates them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that participants need to order to exercise their rights and interests under the Plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding Plan investments/investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.

204.    Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, these Defendants knew or should have known that, as described herein, the Proprietary Funds were not suitable and appropriate investments for the Plan.  The Proprietary Funds included in the Plan during the Class Period, whether by excessive fees and/or sustained poor performance, clearly did not serve the Plan's stated purpose.  Yet, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable excessive costs and the loss of earnings that resulted.

205.    Defendants additionally breached their duties to prudently and loyally manage the Plan's assets by paying excessive fees for recordkeeping, administration, and/or managed account

services and failing to disclose the true financial relationships among Northwest, FE, and/or other entities.

206.    Defendants additionally breached their duties to prudently and loyally manage the Plan's assets by failing to have in place a method of systematic review, by impartial, non-conflicted fiduciaries, of the Plan's individual investment options, of the portfolio as a whole, and of the various services provided by service providers including Northwest and FE, in order to ensure that the investments and/or services were suitable and appropriate for the objectives of the Plan and did not charge Plan Participants excessively.

207.    Defendants further breached their duties of loyalty and prudence by failing to divest the Plan of the Proprietary Funds when they knew or should have known that they were not suitable and appropriate Plan investments.

208.    Defendants further breached their duties of prudence and loyalty by failing to properly disclose the existence of and how to selected the Expanded Choice options within the investment options of the Plan, thereby making it more likely that Plan participants would remain in the Proprietary Funds which comprised most of the core investment options.

209.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments. Had Defendants taken appropriate steps to comply with their fiduciary obligations, participants could have liquidated some or all of their holdings in the Proprietary Funds and thereby eliminated, or at least reduced, losses to the Plan.

210.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## SECOND CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries and Provide Them with Accurate Information**
**(Breaches of Fiduciary Duties in Violation of § 404 by Exelon and the Board of Directors)**

211.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

212.     At all relevant times, as alleged above, by Exelon and the Board of Directors were fiduciaries to the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

213.     At all relevant times, as alleged above, the scope of the fiduciary responsibility of these Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including without limitation, the members of the various Committees and the investment managers and others to whom fiduciary responsibilities were delegated.

214.     The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the monitoring fiduciaries had the duty to:

(a)     Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

(b)     Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(c)     Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(d)     Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(e)     Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investments; and

(f)     Ensure that the monitored fiduciaries report regularly to the monitoring fiduciaries. The monitoring fiduciaries must then review, understand, and approve the conduct of the hand-on fiduciaries.

215.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know and reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

216.    Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to monitor and evaluate the performance of the Proprietary Funds, such that the Plan lost millions of dollars to excessive fees and/or poor performance; (b) failing to monitor the processes and policies by which the Plan's investments and service providers were selected, allowing the Plan's assets to remain in high-fee, poorly performing investment options and leading Plan Participants to pay unreasonable recordkeeping, administration, and/or managed account service fees; (c) failing to remove the Proprietary Funds as investment options, Northwest as recordkeeper, and/or FE as managed service provider due to their imprudence and/or unreasonable expense; (d) failing to remove the fiduciaries who had maintained the Proprietary Funds as investment options despite the excessive expense and the poor performance of the funds; and (e) failing to remove the fiduciaries who had selected and maintained the services of Northwest and FE despite the unreasonableness of the fees those providers charged.

217.    Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

218.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiffs and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

219.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

### THIRD CLAIM FOR RELIEF
**Co-Fiduciary Liability for Breaches of the Duties of Prudence, Loyalty, and Failure to Monitor**
**(Breaches of Fiduciary Duties in Violation of ERISA §405(a) by the Board of Directors, the IOC, the CIC, and Douglas J. Brown)**

220.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

221.    At all relevant times, as alleged above, by the Board of Directors, the IOC, the CIC, and Douglas J. Brown were fiduciaries to the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

222.    ERISA §405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which the fiduciary may have had under any other provision of ERISA, if:

    (a)    The fiduciary participates knowingly in or knowingly undertakes to conceal an act or omission of such other fiduciary knowing such act or omission is a breach;

58

(b)   The fiduciary fails to comply with ERISA § 404(a)(1) in the administration of the specific responsibility which give rise to the status as fiduciary, the fiduciary has enabled such other fiduciary to commit a breach; or

(c)   The fiduciary knows of a breach by another fiduciary and fails to make reasonable efforts to remedy it.

223.   Defendants, who are fiduciaries within the meaning of ERISA, and, by their nature of the fiduciary duties with respect to the Plan, knew of each breach of fiduciary duty alleged herein arising out of the management and administration of the plan and its assets, including the continued investment in the Proprietary Funds despite their lower performance and/or higher than market value costs, the payment of excessive recordkeeping, administration, and other fees to service providers, and the failure to monitor appointees, and knowingly participated in, breached their own duties enabling other breaches, and/or took no steps to remedy these and the other fiduciary breaches.

224.   Despite this knowledge, Defendants failed to act to remedy the several violations of ERISA, as alleged in Counts I and II.

225.   Pursuant to ERISA $405(a) (1) and (2), Defendants are liable for the breaches of the other Defendants and are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## JURY DEMAND

226.   Plaintiffs demand a jury.

## PRAYER FOR RELIEF

227.   WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A. A Declaration that the Defendants, and each of them, have breached their fiduciary duties to the participants;

B. A Declaration that the Defendants, collectively and separately, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D. Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as a result of breaches of fiduciary duty;

E. Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F. An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the Proprietary Funds maintained by the Plan in proportion to the accounts' losses attributable to excessive fees and underperformance of the proprietary investments;

G. An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H. An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I. An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

Dated:  December 6, 2021

Respectfully submitted,

*/s/ Michael M. Mulder*
Michael M. Mulder
Elena N. Liveris
THE LAW OFFICES OF MICHAEL M.
MULDER
1603 Orrington Avenue, Suite 600
Evanston, Illinois 60201
Telephone: (312) 263-0272
mmmulder@mmulderlaw.com
eliveris@mmulderlaw.com

Todd S. Collins
Karen Handorf (*pro hac vice* forthcoming)
Abigail Gertner (*pro hac vice* forthcoming)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
tcollins@bm.net
khandorf@bm.net
agertner@bm.net

Eric Lechtzin
EDELSON LECHTZIN LLP
3 Terry Drive, Suite 205
Newtown, PA 18940
Telephone: (215) 867-2399
elechtzin@edelson-law.com

John J. Nestico (*pro hac vice* forthcoming)
SCHNEIDER WALLACE
COTTRELL KONECKY LLP
600 Fairview Road, Suite 1200
Charlotte, NC 28210
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
jnestico@schneiderwallace.com

*Counsel for Plaintiffs and the Proposed Class*