### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| FRED BAUMEISTER, KENNETH BERKEIHISER, DWAYNE CLAUSER, JOHN CONLIN, CARL S. LEHMAN, GREG MATTIONI, and WILLIAM RIALE, individually and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>EXELON CORPORATION, et al.,<br><br>Defendants. | Case No. 21-cv-6505<br><br>Judge John Robert Blakey |

### <u>MEMORANDUM OPINION AND ORDER</u>

Fred Baumeister, Kenneth Berkeihiser, Dwayne Clauser, John Conlin, Carl S. Lehman, Greg Mattioni, and William Riale (together, "Plaintiffs") bring this lawsuit on behalf of the Exelon Corporation Employee Savings Plan, themselves, and a putative class.[1] Plaintiffs sue Exelon as well as its Investment Oversight Committee, Board of Directors, and Corporate Investment Committee (together, "Defendants"), alleging violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1106, 1108, 1109, and 1132. Defendants move to dismiss all counts of the operative complaint pursuant to Federal Rule of Civil Procedure

---

[1] The putative class includes at least 40,000 people and is defined as "All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan at any time between December 6, 2015 and the date of judgment." ¶ 47.

1

12(b)(6). [67]. For the reasons explained herein, the Court grants Defendants'
motion.

## I.    **Factual Allegations**[2]

Defendant Exelon is in the business of energy generation, sale, and delivery.
[65] ¶ 32. It has subsidiaries including utility companies and plants across the United
States. *Id.* The Exelon Corporation Employee Savings Plan (the "Plan") is a 401(k)
defined contribution retirement plan made available to employees of Exelon and its
subsidiaries. *Id.* ¶¶ 43–44. The Plan confers tax benefits upon participating
employees to incentivize retirement saving. *Id.* ¶ 2. Plaintiffs are Plan participants
and beneficiaries. *Id.* ¶¶ 15–31.

In addition to Defendant Exelon, the operative Amended Complaint names
three other defendants: (1) Exelon's Investment Oversight Committee ("IOC"), which
previously bore responsibility for general oversight of Exelon's investment
management functions, *id.* ¶ 34; (2) the Exelon Board of Directors (the "Board"),
which now bears responsibility for overseeing Exelon's investment management
functions, *id.* ¶ 35; and (3) the Corporate Investment Council ("CIC"), which is the
entity responsible for approving the Plan's investment strategy, allocations, and
investment limits, *id.* ¶ 36. Defendant Exelon also acted through the Exelon
Investment Office ("EIO"), which is the entity with the authority to select and monitor
investment options. *Id.* ¶¶ 36–37.

---

[2] For purposes of the motion to dismiss, the Court draws the facts from the Amended Complaint, [65].

According to the Amended Complaint, in 2014, the EIO replaced certain investment options available to Plan participants with new, proprietary funds of its own creation. *Id.* ¶¶ 73, 98. These funds included a suite of target date funds (the "Exelon TDFs"), which adjust a participant's investments over time according to a risk "glide path" calculated based upon the participant's anticipated retirement date. *Id.* The EIO also created Exelon's U.S. Equity Fund, International Equity Fund, and Fixed Income Fund (together with the Exelon TDFs, the "Proprietary Funds"). *Id.* ¶¶ 73, 120. The majority of the Plan's assets are invested in the Proprietary Funds. *Id.* ¶ 99.

The Proprietary Funds are managed by multiple investment managers, who were selected by the EIO. The EIO also hired J.P. Morgan Investment Management Inc. to manage the allocation or the "glide path" of the Exelon TDF assets over time. *Id.* ¶ 73.

According to the Amended Complaint, the Proprietary Funds did not perform as well as other available funds on the market. To support this allegation, Plaintiffs cite data tracking the funds' performance in comparison to other funds with similar investment strategies and goals to demonstrate that the Proprietary Funds received lower returns and charged higher fees. *Id.* ¶¶ 114–129.

Plaintiffs allege that Defendants failed to meaningfully review the performance and cost of similar funds. *Id.* ¶ 130. Had Defendants performed such a review, they would have seen that the Proprietary Funds were underperforming and

comparatively expensive, and the Defendants could have negotiated lower rates for better performing investment options. *Id.* ¶¶ 130–31.

Further, Plaintiffs allege that Plan participants did not have meaningful access to some of the alternative investments the Plan nominally offered, which pushed participants toward the allegedly underperforming and expensive Proprietary Funds. *Id.* ¶ 97.

Plaintiffs also challenge the EIO's decision to rely upon Northwest Plan Services, Inc. ("Northwest") as its recordkeeper and Edelman Financial Engines ("Financial Engines") as a managed account services provider. According to the Amended Complaint, these services were not worth their costs to participants. *Id.* ¶¶ 174–85, 196–207. The Amended Complaint also alleges that, in its arrangements with other plans and recordkeepers, Financial Engines often remits a significant percentage of its fees to the recordkeeper. Plaintiffs suggest that Financial Engines may have done so here, and that Defendants thus failed to report the full amount of compensation Northwest received. *Id.* ¶¶ 170, 211.

The Amended Complaint highlights that the Plan was not the EIO's only priority. Instead, the EIO was "formed and originally conceived" to manage a variety of "long-term obligations for which Exelon bears all investment risk." *Id.* ¶ 101. Thus, "the vast majority of the EIO's time is spent on projects unrelated to the 401(k) Plan." *Id.* By "selecting itself as a fund manager for the 401(k) Plan, the EIO tasked itself with additional responsibilities" connected to "a plan in which the individual participants bear the investment risk and are responsible for allocating their

accounts among those investment options." *Id.* According to the Amended Complaint, "discovery will show that when the EIO presents reports to the CIC on investment performance, it does so only twice a year." *Id.* ¶ 102. Frequently during those biannual, two-hour meetings, the Plan and its investment performance "is reviewed for only five minutes." *Id.*

Drawing upon these allegations, Plaintiffs bring four counts under ERISA. Count One alleges breach of fiduciary duty by all Defendants. Counts Two and Three contain derivative failure to monitor and co-fiduciary liability claims. And Count Four asserts a prohibited transactions claim. Defendants move to dismiss all counts.

## II.  Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "the complaint must provide enough factual information to state a claim to relief that is plausible on its face and raise a right to relief above the speculative level." *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief"). A court deciding a Rule 12(b)(6) motion must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded facts as true, and draw all reasonable inferences in the plaintiff's favor." *Lax v. Mayorkas,* 20 F.4th 1178, 1181 (7th Cir. 2021). But the court need not accept as true "statements of law or unsupported conclusory factual allegations." *Id.* (quoting *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 586 (7th Cir. 2021)). While "detailed factual

allegations" are not necessary to survive a motion to dismiss, the standard "does require 'more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action to be considered adequate.'" *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019) (quoting *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016)).

Dismissal for failure to state a claim is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). In putative ERISA class actions, "Rule 12(b)(6) motions are an important mechanism for weeding out meritless claims. Courts apply a careful, context-sensitive scrutiny of a complaint's allegations to divide the plausible sheep from the meritless goats." *Albert v. Oshkosh Corp.*, 47 F.4th 570, 577 (7th Cir. 2022). Because ERISA fiduciaries may face circumstances that "will implicate difficult tradeoffs," courts should appreciate "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Id.*

## III. Analysis

Defendants move to dismiss all four counts of the Amended Complaint, and the Court examines each in light of the legal standards set forth above.

### A. Count One (Breach of Fiduciary Duty)

In Count One, Plaintiffs allege that Defendants breached their duties of prudence and loyalty. To state a claim for breach of fiduciary duty under ERISA, the plaintiff must plead: (1) that the defendant is a plan fiduciary; (2) that the defendant

6

breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff. *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016). For purposes of the motion to dismiss, Defendants do not dispute their status as Plan fiduciaries under ERISA.

### 1. Duty of Prudence

The Court turns first to the alleged breaches of the duty of prudence. ERISA requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. § 1104(a)(1); *see also Tibble v. Edison Int'l*, 575 U.S. 523, 528 (2015). An ERISA fiduciary's duty is "derived from the common law of trusts," and in determining the contours of the duty, courts thus refer to the law of trusts. *Tibble*, 575 U.S. at 528–29. As relevant here, ERISA fiduciary duties include the duty to exercise prudence in selecting investments, the continuing duty to monitor investments and remove imprudent ones, and the duty to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities." *Hughes v. Nw. Univ.*, 63 F.4th 615, 627 (7th Cir. 2023) ("*Hughes II*"); *Tibble*, 575 U.S. at 529. To plead a breach of the duty of prudence under ERISA, a plaintiff must plausibly allege fiduciary decisions outside the range of reasonableness. *See Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022) ("*Hughes I*").

### a) The Proprietary Funds

According to the Amended Complaint, the Plan previously included a suite of target date funds managed by subsidiaries of the Vanguard Group (the "Vanguard

TDFs") as its "Qualified Default Investment Alternative." [65] ¶ 46. In July 2014, Defendants decided to replace the Vanguard TDFs with a new suite of custom, proprietary target date funds. *Id.* The Exelon TDFs became the new default option for Plan participants. *Id.* At the same time, Defendants also established three other proprietary funds: the U.S. Equity Fund, the International Equity Fund, and the Fixed Income Fund. *Id.* ¶ 73. The Exelon TDFs invested in these funds, and these funds were also available on the menu of investments from which Plan participants could choose. *Id.*

Plaintiffs claim that the Defendants violated their duty of prudence by continuing to include the Proprietary Funds in the Plan options despite their continued underperformance and excessive fees. The Court considers Plaintiffs' claim of imprudence with regard to each of the Proprietary Funds in turn.

#### (1)    *Exelon Target Date Funds*

Target date funds, as described above, rely upon a participant's anticipated retirement date to choose a portfolio of investments with different levels of risk that adjust over time according to a "glide path." All target date funds, regardless of provider, employ the basic strategy of decreasing risk over time. Different providers implement different glide paths, and while the types of underlying investments are often similar, "there are minor differences between advisors" when it comes to the "recipe of asset classes" used. [65] ¶ 11.

When compared to the entire TDF market, the Amended Complaint establishes Exelon TDFs generally performed in the second or third quartile.

Performance in the middle of the pack is not sufficient to suggest imprudence. ERISA does not enable Plaintiffs to sue simply because a fund is not the top performer—instead, the allegations must show that the fiduciary acted outside the permissible range of prudent decisions. *See Coyer v. Univar Solutions USA Inc.*, No. 1:22 CV 0362, 2022 WL 453471, at *5 (N.D. Ill. Sept. 28, 2022) (Courts do not "infer imprudence every time a fiduciary retains a fund that fails to turn in best-in-class performance for any specific period."); *Divane v. Nw. Univ.*, 953 F.3d 980, 992 (7th Cir. 2020), *vacated and remanded on other grounds sub nom. Hughes I*, 142 S. Ct. 737 (In ERISA cases, "the ultimate outcome of an investment is not proof of imprudence.").

Plaintiffs argue, however, that the Exelon TDFs' performance ought not be measured against the TDF marketplace as a whole, but instead against six chosen comparators. Studying the performance of these comparators relative to their fees, Plaintiffs suggest, will show that a prudent fiduciary would have divested of the Exelon TDFs.[3]

---

[3] Part of this theory relies upon the reasoning that actively-managed funds such as the Proprietary Funds are a worse investment decision than passively-managed funds. The Seventh Circuit rejected the contention in *Albert* that a fiduciary's decision to offer actively-managed funds is, on its own, sufficient to establish a breach. Instead, as Defendants note, this decision is generally understood to fall within the reasonable range of options among which a fiduciary may choose. *See Smith v. CommonSpirit Health*, 37 F.4th 1160, 1165 (6th Cir. 2022) (Actively-managed funds "represent a common fixture of retirement plans, and there is nothing wrong with permitting employees to choose them in hopes of realizing above-average returns over the course of the long lifespan of a retirement account…It is possible indeed that denying employees the option of actively managed funds, especially for those eager to undertake more or less risk, would itself be imprudent."). Of course, a plaintiff may nonetheless establish that a fiduciary's decisions with regard to the actively-managed funds it offers were imprudent due to excessive management expenses. *Id.* ("Even if CommonSpirit did not violate a fiduciary duty by offering actively managed plans in general, it is true, the company still could violate ERISA by imprudently offering *specific* actively managed funds."). To do so, however, the Amended Complaint must provide a "sound basis for comparison—a meaningful benchmark." *Albert*, 47 F.4th at 580.

The Amended Complaint includes a chart, [65] ¶ 114, showing the different asset classes, in which the Exelon TDFs invest as compared to six other suites of target date funds. Based upon the similarities in asset classes in which the suites invest, the Amended Complaint alleges that the Exelon TDFs "are nearly identical in strategy and composition to the American Funds Target Date Retirement Series, while they are substantially similar to TDFs from even more investment firms, including T. Rowe Price and BlackRock." *Id.* ¶ 115.

Even accepting Plaintiffs' choice of comparators, the Amended Complaint fails to allege that the Exelon TDFs were materially out of step with the six other funds selected by Plaintiffs such that any reasonable fiduciary would have divested. The chart in the Amended Complaint, *id.* ¶ 116, illustrates the annualized returns for the Exelon TDFs and each of the six comparators. For funds with a target retirement date in 2020 or earlier, the Exelon TDFs were in the middle of the pack; three of the six comparators had returns lower than Exelon, net of fees. *Id.* The funds with a target date of 2025 or 2030 also had one comparator with lower returns than Exelon. *Id.* Only in the comparison of funds with target dates between 2035 and 2050 did Exelon perform the worst. *Id.* But even considering the largest disparity illustrated on this chart—the Exelon 2050 TDF compared to the American Funds 2050 target date fund—Exelon only returned 1.87% less than American Funds. *See id.* The returns achieved by Plaintiffs' comparators, thus remain, on their own, insufficient to demonstrate imprudence by the Plan fiduciaries. *See Griffin v. Flagstar Bancorp, Inc.*, 492 F. App'x 598, 604–05 (6th Cir. 2012) (finding plausible allegations of

imprudence for an investment whose value fell from $14.95 to $0.68 per share and that analysts described as "a black hole"); *Birse v. CenturyLink, Inc*, No. 17-cv-02872-CMA-NYW, 2019 WL 1292861 at *5 n.2 (D. Colo. Mar. 20, 2019) (distinguishing the plaintiffs' allegations of 2–3% underperformance, which did not state a claim, from cases involving allegations of at least 10% underperformance, which some courts have found could state a claim); *Jones v. Dish Network*, No. 22-cv-00167-CMA-STV, 2023 WL 2796943, at *14 (D. Colo. Jan. 31, 2023) ("modestly trailing" comparators does not suffice to show imprudence).

Plaintiffs also allege that the comparators' fees are "either significantly less expensive than the Exelon TDFs or have such markedly better performance as to completely negate any negligible savings by the lower fee offered by Exelon's TDFs." *Id.* ¶ 117. Neither claim is supported by the allegations. The chart in the Amended Complaint illustrates that three of the comparator funds are more expensive than Exelon and three are less expensive. *Id.* Thus, Exelon also falls within the middle of the pack with regard to fees. And, as the Court has already explained, none of the more expensive comparator funds had "such markedly better performance" that would excuse their higher fees, but call into question the prudence of Exelon's fees.

Additionally, even if the Exelon TDFs had performed substantially worse and/or charged significantly higher fees than the identified comparators, the allegations remain insufficient to show Plaintiffs' chosen comparators constitute adequate benchmarks. Plaintiffs allege that the Exelon TDFs are "nearly identical" or "substantially similar" in strategy and composition to the proposed comparators,

but they fail to provide any supporting facts for these conclusions. The Amended Complaint states that: (1) the comparator TDFs each invest in many of the same asset classes as the Exelon TDFs; (2) the Exelon TDFs invest in some of the same underlying assets as the comparator TDFs; and (3) the Exelon TDFs "invest in active and passively managed funds, including Vanguard." [65] ¶ 114–15. But Plaintiffs do not allege any facts regarding the relative weighting of each asset class, which makes it impossible to infer each fund's actual composition or risk strategy. Further, while the Exelon TDF invests in 25 funds, the comparator TDFs invest in anywhere from four to 30 distinct funds. *Id.*

Notably, Plaintiffs' imprudence argument rests, in part, upon the allegation that it was inappropriate for the EIO to compare the Exelon TDF to all marketplace TDFs "regardless of strategy or composition," but Plaintiffs fail to allege why the six funds they identify are, in fact, superior to other TDFs as comparators. Plaintiffs' own Amended Complaint acknowledges that all TDFs have "significant overlap in the types of investments used" and "there are minor differences between advisors in asset classes." *Id.* ¶ 111. Yet, Plaintiffs' chart only shows that the comparator TDFs invest in *some* of the same asset classes as the Exelon TDF, *id.* ¶ 114, and it provides no additional information regarding the funds' glide paths or risk allocations. *Id.* ¶ 111. As a result, Plaintiffs have failed to plead facts sufficient to support the inference that its six proposed comparators are an appropriate benchmark against which to measure the Exelon TDFs. *See Albert*, 47 F.4th at 582 (dismissing a claim that lacked "detailed allegations providing a 'sound basis for comparison'") (quoting *Meiners v.*

12

*Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018)); *see also Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 281 (8th Cir. 2022) (finding comparators insufficient where "missing details" included whether the peer-group funds "have similar investment strategy, and reflect a similar risk profile").

### (2) *Exelon U.S. Equity Fund*

The Exelon U.S. Equity Fund invests broadly in publicly traded U.S. equities. For the combined portfolio, the EIO identified a broad market index as its benchmark: the Russell 3000. [65] ¶ 121. According to the Amended Complaint, a "survey of the market finds there are 16 comparator funds which invest comparably to the Exelon fund and use the same benchmark… for disclosure purposes." *Id.* ¶ 122.

Plaintiffs argue that the Exelon U.S. Equity Fund also underperformed by (1) returning 11.13% compared to the benchmark index's return of 12.45%; and (2) posting lower returns than seven of the 16 identified comparators. *Id.* ¶ 123. But Plaintiffs fail to provide data for the other nine comparators. *Id.* The Court cannot reasonably infer that the Exelon U.S. Equity Fund underperformed comparators at a level sufficient to establish imprudence when the Amended Complaint contains no allegations that Exelon's fund performed *any worse at all* than nine of the 16 comparators. Thus, Plaintiffs' allegations regarding the Exelon U.S. Equity Fund do not plausibly state a claim of imprudence.

### (3) *Exelon International Equity Fund*

Plaintiffs' allegations regarding the Exelon International Equity Fund suffer the same defect. The Exelon International Equity Fund uses the MSCI ACWI Ex

USA Index as its benchmark, and Plaintiffs allege that there are 40 comparator funds that use this same benchmark. *Id.* ¶ 124–25. From 2015 to 2020, the Exelon International Equity Fund returned 7.03% while the MSCI ACWI Ex USA Index returned 6.84%. *Id.* ¶ 126. Although the Exelon International Equity Fund exceeded its benchmark index, Plaintiffs allege imprudence because "many other investment options…performed demonstrably better over the same time period." *Id.* To illustrate this point, Plaintiffs list data for 19 comparators which returned between 7.08% and 9.93%. *Id.* The Amended Complaint provides no data for the remaining 21 comparators. As above, the Court cannot reasonably infer that the Exelon International Fund performed worse than the proposed comparators when Plaintiffs fail to provide any information regarding more than half of those funds. Nor does the data provided give rise to an inference of imprudence. Plaintiffs fail to state a claim of imprudence as to the Exelon International Equity Fund.

### (4) Exelon Fixed Income Fund

Plaintiffs' allegations regarding the Exelon Fixed Income Fund fare no better. The Exelon Fixed Income Fund uses the Bloomberg US Aggregate Bond Index as its benchmark. *Id.* ¶ 127. The Exelon Fixed Income Fund and the Bloomberg US Aggregate Fund both achieved a 3.78% return from 2015 to 2020. *Id.* ¶ 129. In the Amended Complaint, Plaintiffs identify 61 funds that use the same benchmark and allege that 27 of those 61 funds "performed demonstrably better over the same time period." *Id.* ¶¶ 128–29. But Plaintiffs fail to make any allegations about the other 34 funds. *Id.*

14

Plaintiffs allege that, had the EIO or any Defendant meaningfully reviewed the comparator market, they would have necessarily realized the actively-managed Proprietary Funds were imprudent investments. *Id.* ¶ 130. But Plaintiffs fail to include more than half of the data relevant to this analysis, and the allegations prevent any reasonable inference about the performance of the actively-managed Proprietary Funds as compared to other market funds. Similarly, the allegations fail to permit a plausible inference that the actively-managed Proprietary Funds were more expensive than the comparators' because the included data disproves the proposition. *See id.* ¶¶ 123, 126, 129.

Plaintiffs' claim that Defendants followed an imprudent process for reviewing and managing the Plan stems primarily from the allegation that Defendants should have taken different actions once they realized the Plan was underperforming and overly expensive. *Id.* ¶¶ 98, 130. Because Plaintiffs have not sufficiently pled that any of the Proprietary Funds underperformed or charged excessive fees, these allegations cannot support a claim for breach of the duty of prudence.

The remaining allegations regarding Defendants' imprudent management process are not, on their own, sufficient to state a claim for breach of the duty of prudence. Plaintiffs allege that the EIO's primary focus was not the Plan, but rather the $35 billion in other Exelon investments for which Exelon bore the risk and that, during the EIO's biannual meeting with the CIC, the EIO spent only five minutes reviewing the Plan. ¶ 101–02. Plaintiffs then infer that, due to this relatively limited review time, "Defendants have failed to critically assess the performance or cost of

the Proprietary Funds in the 401(k) plan at any time during the Class Period." *Id.* But Plaintiffs do not allege that the EIO's biannual meeting with the CIC was the only review the EIO performed of the Plan; nor do they allege how the EIO's focusing on other investments caused any harm to the Plan or its participants, other than the unsupported underperformance and excessive fees claims discussed above.

Plaintiffs also allege that some Plan participants did not have access to the Plan's "Expanded Choice" options. *Id.* ¶ 97. Prior to 2018, investments in those funds were not listed on quarterly statements, and Plan participants who learned of and wished to access those funds had to jump through certain administrative hoops to do so. *Id.* Plaintiffs allege that this had the effect of steering participants toward the Proprietary Funds and thus harmed Plan participants because the Proprietary Funds were imprudent. But this claim also necessarily depends upon the Plaintiffs' claim of imprudence, and so Plaintiffs have failed to allege a breach based upon this omission.

### b)      Recordkeeping & Administrative Expenses

Plaintiffs allege that Defendants also breached their fiduciary duty by causing the Plan to pay excessive recordkeeping fees. The duty of prudence "includes a continuing duty to monitor plan expenses and 'incur only costs that are reasonable in amount and appropriate' with respect to the services rendered. *Hughes II*, 63 F.4th at 631 (quoting *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016)). Thus, to plead a breach, Plaintiffs must allege that Defendants "incurred unreasonable recordkeeping fees and failed to take actions that would have reduced such fees." *Id.*

The Seventh Circuit's decisions in both *Albert* and *Hughes II* addressed the plausibility of excessive recordkeeping claims. In *Albert*, the Seventh Circuit dismissed a recordkeeping claim because the plaintiff alleged only that other recordkeepers charged lower fees. *Albert*, 47 F.4th at 579. Plaintiff there made no allegations regarding the "quality or type of recordkeeping services the comparator plans provided." *Id.*

In contrast, the plaintiffs in *Hughes II* stated a claim for excessive recordkeeping because they alleged that the "quality or type of recordkeeping services provided by competitor providers are comparable to" those provided by the defendants' recordkeepers, and the fees charged "were excessive relative to the recordkeeping services rendered." 63 F.4th at 632.

This case falls on the *Albert* side of the scale: Plaintiffs have failed to allege that their proposed comparators offered the same services as the Plan at a lower price per participant. Specifically, Plaintiffs fail to account for any compensation other than direct compensation reported on each plan's Form 5500. Plaintiffs point to the table in the Amended Complaint as evidence that each of the comparators paid less for recordkeeping services than the Plan. [65] ¶ 172. The information in this table was taken from each plan's Form 5500 and includes, among other things, the number of participants, the amount of assets in the plan, the "RK&A Price," and the per participant fee. *Id.* The "RK&A" price corresponds to section 2(d) of Form 5500 Schedule C, which contains the "direct compensation paid by the plan" to its recordkeeper. But the table in the Amended Complaint does not provide for any

indirect compensation paid to the service provider, which is a separate question on Form 5500 Schedule C. While the Plan's Form 5500 from the year 2018 reported that its service provider did not receive indirect compensation, certain plan comparators reported that their service providers did.[4]  Thus, the Court cannot draw any reasonable inference regarding whether the Plan's total recordkeeping fees were excessive compared to any of the proposed comparators total fees.

Plaintiffs argue that this methodological error is irrelevant, because "there is no requirement to provide comparators to state a claim for excessive fees." [73] at 11. Plaintiffs cite *Coyer* to support their position, but the court in *Coyer* found that, under *Albert*, a plaintiff *does* need to "provide comparative context" to support a claim for excessive recordkeeping fees, and the plaintiffs in that case, in fact, did so.  *Coyer*, 2022 WL 4534791, at *5.  Regardless, Plaintiffs still need to allege facts sufficient to demonstrate that "the recordkeeping fees were excessive relative to the services rendered."  *Albert*, 47 F.4th at 580 (citing *Smith*, 37 F.4th at 1169).  And Plaintiffs allege only that the fees paid by the Plan were excessive as compared to the fees paid by the proposed comparators for similar services.

---

[4] The Court may properly consider the Forms 5500 of the Plan and the comparators because Plaintiffs reference and rely upon them in the Amended Complaint.  Also, because they are publicly available on the Department of Labor website, the Court may properly take judicial notice of them.  *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (court may consider "documents that are critical to the complaint and referred to in it"); *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) (on motion to dismiss, court may consider "documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice"); *Pickett v. Sheridan Health Care Center*, 664 F.3d 632, 648 (7th Cir. 2011) ("We have recognized the authority of a court to take judicial notice of government websites.").

As a result, Plaintiffs fail to state a claim for breach of the fiduciary duty of prudence based upon excessive recordkeeping fees.[5]

### c) Monitoring Managed Account Services Expenses

Plaintiffs also allege that Defendants violated their fiduciary duty of prudence by failing to monitor the fees charged by the Plan's services provider, Financial Engines. But, as with their recordkeeping claim, Plaintiffs fail to allege facts sufficient to demonstrate that the fee Financial Engines charged for managed account services was excessive.

Financial Engines provided two different programs to Plan participants: the Management Program and the Personal Advisor Program. [65] ¶ 197. Participants who sign up for these services are charged an annual fee that is a pre-determined percentage of their account balance. [65] ¶ 193.

Financial Engines charged Plan participants who chose to enroll in the Management Program 0.50% on the first $100,000 of assets, 0.45% on the next $150,000, and $0.30% on assets over $250,000. *Id.* ¶ 198. Plaintiffs claim that "similarly situated plans" had lower fee arrangements. *Id.* ¶ 202. For example, participants in the Comcast 401(k) plan pay no fees on the first $25,000, 0.30% on the

---

[5] While the Court's ruling turns upon the flawed methodology Plaintiffs used to calculate the total fees paid by the Plan and the proposed comparators, the Court also notes that none of the proposed comparators offered the same services as the Plan. [65] ¶ 172. The Plan reported contracting for two services on Form 5500 (16 – Consulting (general) and 64 – Recordkeeping fees), but the only two comparators who contracted for 16 – Consulting (general) did not contract for 64 – Recordkeeping fees at all. *Id.* Further, Plaintiffs allege that each of the comparator plans had "similar sizes of assets under management in 2018." *Id.* ¶ 172. Setting aside that Plaintiffs only compare one year within the relevant 5-year period, the amount of assets under management ranges from $355 million (Dollar General) to $17.2 billion (Raytheon). *Id.* Only two of those eleven comparators have assets greater than Exelon's $8.48 billion, and of those two, only one reported that it contracted for recordkeeping fees. *Id.*

next $225,000, and 0.20% on the remainder; and participants in the Marsh & McLennan Companies plan pay 0.30% on the first $100,000, 0.25% on the next $150,000, and 0.15% on the remainder. *Id.*

According to Plaintiff, Financial Engines' rates were "excessive and unreasonable" both because they were more expensive than the Comcast and Marsh & McLennan plans and because "the reasonable fee for the Plan's Management program service was zero or very close to zero." [65] ¶¶ 204, 206. But neither argument is availing. First, Plaintiffs fail to provide any information about these proposed comparator plans, including their size or the quality or types of services they provide, preventing the Court from inferring anything about the Plan's fees in comparison. [65] ¶ 202. And even if the proposed comparators were appropriate, the minor differences in fee structure among the three plans hardly rise to the level of "excessive."[6]

Second, Plaintiffs' assertion that the value of the program is zero finds no support in the allegations. Plaintiffs state that the service "added no material value to participants" because the "asset allocation created by the service was not materially different than the asset allocation of the age-appropriate target date option made available to the Plan's Participants at a lower fee." *Id.* ¶ 205. Even if this suggested that the value of the service is zero, Plaintiffs identified two

---

[6] The Plan's weighted average fee for assets under $250,000 is 0.47%. The Comcast and McLennan plans' weighted average fee for assets under $250,000 is 0.27%, representing a 0.20% difference in fees. [65] ¶¶ 198, 202. The Plan's fee for assets over $250,000 is 0.30% compared to Comcast's fee of 0.20% and McLennan's fee of 0.15%, representing a 0.10% and 0.15% difference in fees, respectively. *Id.* As previously discussed, these minor variations in fee structures, on their own, are insufficient to demonstrate imprudence.

comparators who allegedly provided "similar or identical managed account services," both of which charged fees in excess of zero dollars. *Id*. ¶¶ 201–02.

Under its Personal Advisor program, Plan participants are charged an annual fee of 0.95% on the first $100,000, 0.90% on the next $150,000, and 0.85% on assets over $250,000 to work with a dedicated financial advisor. *Id*. Plaintiffs have failed to allege any facts regarding this program that would give rise to an inference of excessive fees.

In short, Plaintiffs fail to state a claim for breach of fiduciary duty based upon Defendants' failure to monitor managed account services expenses. And, for the reasons discussed above, the Court dismisses Plaintiffs' breach of fiduciary duty claim as to the duty of prudence.

## 2. Duty of Loyalty

Plaintiffs also allege that Defendants breached their duty of loyalty as to both the selection of funds and the selection of Northwest as recordkeeper. Defendants argue that Plaintiffs' duty of loyalty claims merely recast their duty of prudence claims, an argument Plaintiffs fail to address in their response and thus waive. [68] at 15; [74] at 15; *Wojtas v. Capital Guardian Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2007) (finding failure to assert argument in response to motion to dismiss constitutes waiver); *see also Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (same). The Court nonetheless considers whether the Amended Complaint plausibly alleges a breach of the duty of loyalty.

An ERISA fiduciary's duty of loyalty requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interests of the participants and beneficiaries" with the "exclusive purpose" of "providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan." *Albert,* 47 F.4th at 582 (citing 29 U.S.C. § 1104(a)(1)(A)).

With regard to Plaintiffs' fund selection claim, the Amended Complaint contains no factual allegations to support a breach of the duty of loyalty. Plaintiffs do not allege self-dealing at the expense of the Plan; nor do they otherwise allege that Defendants failed to discharge their duties solely in the interest of the Plan and its participants. *See Albert*, 47 F.4th at 583.

With regard to the Plan's recordkeeping expenses, the Amended Complaint only contains one allegation relevant to the duty of loyalty: "Discovery will show that to the extent Defendants solicited bids for the RK&A services during the Class Period, they did not compare services and costs as would be provided to the Plan but instead chose a recordkeeper based on the services that the winner bidder [sic], NorthWest, would provide to other Exelon plans, and was not selected on the services and cost to provide such services to the Plan only." [65] ¶ 182. But Plaintiffs fail to allege that Northwest provided different or better services to other Exelon plans at the Plan's expense; nor do they otherwise explain how the alleged incentives conflicted or caused any harm to the Plan. Further, any theory of harm here ultimately depends upon the theory that Defendants' retention of Northwest was imprudent. Without allegations to suggest that the fees charged by Northwest were "unreasonable in light of available

22

alternatives," *Albert*, 47 F.4th at 583, Plaintiffs fail to state a claim based upon Defendants' duty of loyalty, and this claim is dismissed.

**B.    Count Two (Failure to Monitor) and Count Three (Co-Fiduciary Liability)**

Counts Two and Three assert derivative failure to monitor and co-fiduciary liability claims. As in *Albert*, Plaintiffs' claims for failure to monitor and co-fiduciary liability "rise or fall" with their duty of prudence and duty of loyalty claims. 47 F.4th at 583. Because Plaintiffs have failed to state a claim for breach of fiduciary duty, these claims also fail. *See id.; see also See Mazza v. Pactiv Evergreen Servs. Inc.*, No. 22 C 5052, 2023 WL 3558156, at *4 (N.D. Ill. May 18, 2023) (denying dismissal of failure to monitor claim because plaintiff "sufficiently pleaded his breach of the duty of prudence claim"); *Rogers v. Baxter Int'l Inc.*, 710 F. Supp. 2d 722, 740 (N.D. Ill. 2010) (finding that a failure to monitor claim is "derivative in nature and must be premised" on "an underlying breach of fiduciary duty"). The Court dismisses these claims.

**C.    Count Four (Prohibited Transactions)**

In their final claim, Plaintiffs allege that Defendants violated ERISA § 406(a), 29 U.S.C. § 1106(a) by causing the Plan to engage in prohibited transactions. ERISA expressly prohibits certain kinds of transactions between a plan and a "party in interest." 29 U.S.C. § 1106(a)(1). This provision "supplements the fiduciary's general duty of loyalty… by categorically barring certain transactions deemed likely to injure the pension plan." *Albert*, 47 F.4th at 584 (quoting *Harris Tr. Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241–24 (2000)). The statute provides that a plan

23

fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect… furnishing of goods, services, or facilities between the plan and a party in interest." 29 U.S.C. § 1106(a)(1)(C). In turn, ERISA defines a "party in interest" of an employee benefit plan to include "any fiduciary," "a person providing services to the plan," "an employer any of whose employees are covered by such plan," and a variety of other categories. 29 U.S.C. § 1002(14).

Plaintiffs argue that Defendants engaged in a prohibited transaction as defined in 29 U.S.C. § 1106(a)(1)(C) by failing to obtain detailed disclosures from Northwest regarding its compensation. [73] at 12–13. As a result, Defendants failed to consider millions of dollars of fees paid by Financial Engines to Northwest in determining whether the service agreement with Northwest constituted an exemption to the prohibited transactions under 29 U.S.C. § 1108.

In *Albert*, the Seventh Circuit rejected the argument that "routine payments for plan services" constitute prohibited transactions under § 1106(a)(1) "because it would prohibit fiduciaries from paying third parties to perform essential services in support of a plan." 47 F.4th at 584. The court explained that it "would be nonsensical to read § 1106(a)(1) to prohibit transactions for services that are essential for defined contribution plans, such as recordkeeping and administrative services." *Id.* Yet, this is precisely the interpretation Plaintiffs propose.

Plaintiffs argue that the transactions at issue in this case are distinguishable from those in *Albert* because they were not *routine* payments for plan services, but

rather unreasonable and excessive payments for plan services. [73] at 13–14. As explained above, Plaintiffs have failed to allege that the fees paid for plan services were unreasonable or excessive. But even if Plaintiffs had alleged facts suggesting that these fees were unreasonable or excessive, this claim amounts to a recast of Plaintiffs' breach of fiduciary duties claim in Count One. Under the rationale of *Albert*, the fact that a plan's routine service payments were excessive or unreasonable does not, on its own, convert the transaction of paying those fees from routine to prohibited, and Plaintiffs cite no authority for this proposition.

Thus, Plaintiffs' attempt to characterize these payments as prohibited transactions that must meet an exemption in § 408(b)(2) of ERISA misunderstands the holding in *Albert*. Those exemptions are irrelevant because routine payments for plan services are not prohibited transactions within the meaning of § 1106(a)(1). *See Albert*, 47 F.4th at 584–85.

Plaintiffs have failed to allege facts sufficient to state a claim based upon prohibited transactions, and this claim is dismissed.

## IV.    Conclusion

For the reasons explained above, the Court grants Defendants' motion to dismiss [67].  The dismissal is without prejudice, however, and this Court permits a final opportunity for Plaintiffs to file an amended complaint by 10/20/2023, if Plaintiffs can, in good faith and consistent with Rule 11, set forth factual allegations to cure the deficiencies discussed above.  If Plaintiffs fail to file an amended complaint by this date, the Court will dismiss this case.

Date: September 29, 2023                              Entered:

John Robert Blakey
United States District Judge